UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEWART TITLE GUARANTY COMPANY, a Texas corporation,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>CREDIT SUISSE, Cayman Islands Branch,<br><br>　　　　　　　Defendant. | Case No. 1:11-CV-227-BLW<br><br><br>**MEMORANDUM DECISION AND ORDER** |
| CREDIT SUISSE, Cayman Islands Branch,<br><br>　　　　　　　Counterclaimant,<br><br>vs.<br><br>STEWART TITLE GUARANTY COMPANY, a Texas corporation,<br><br>　　　　　　　Counterdefendant. | |

## INTRODUCTION

The Court has before it a motion to compel filed by defendant Credit Suisse. The Court heard oral argument on March 26, 2013, and took the motion under advisement. For the reasons explained below, the Court will grant the motion in part by holding that the work product doctrine does not protect the documents at issue here. The Court will

**Memorandum Decision & Order – page 1**

reserve ruling on the attorney/client privilege issues pending an in camera review to be conducted under the standards set forth below.

## LITIGATION BACKGROUND

Credit Suisse was insured by Stewart Title. When Credit Suisse was sued, Stewart Title accepted the tender of defense, hiring attorneys at the law firm of Fabian Clendenin to represent Credit Suisse. Stewart Title also hired attorneys at the law firm of Faegre Benson to investigate the subject of the lawsuit, and to provide advice on whether Credit Suisse was covered by Stewart Title's policy.

Credit Suisse now seeks to compel production of communications between Stewart Title and the attorneys at Faegre Benson. Stewart Title objects, claiming that the communications are protected by the attorney client privilege and the work product doctrine. To resolve these issues, the Court must examine in detail the background of this litigation and the work that Faegre Benson did for Stewart Title.

In 2006, Credit Suisse loaned $250 million to Tamarack Resort, LLC to construct a ski resort in Donnelly, Idaho. As security for the Loan, Tamarack executed two mortgages on the resort property. Credit Suisse purchased a policy of title insurance from Stewart Title that included mechanic's lien coverage.

In late 2007, Tamarack failed to pay contractors and defaulted on its loan with Credit Suisse. Credit Suisse responded by bringing suit to foreclose the two mortgages. At the same time, contractors and subcontractors began filing actions to foreclose mechanics' liens against the resort property subject to Credit Suisse's mortgages. The

**Memorandum Decision & Order – page 2**

lien claimants asserted that their liens had priority over Credit Suisse's mortgages.

Credit Suisse's foreclosure action and the lien claimants' lawsuits were consolidated, and Credit Suisse tendered the defense of the lien claims to Stewart Title. That tender was accepted and Stewart Title retained attorney Jed Manwaring to represent Credit Suisse. Later, Manwaring was replaced with counsel from the lawfirm of Fabian & Clendenin. All during this time, Credit Suisse's chief counsel was Elizabeth Walker at the law firm of Sidley and Austin.

To investigate the numerous liens that were filed, Stewart Title initially assigned in-house attorney John Holt as the Field Customer Service Representative (FCSR) responsible for the day-to-day management of the lien claims. The duties of an FCSR are described in Stewart Title's Field Customer Service Representative Manual. For example, the FCSR is responsible for investigating the claims, including issues such as priority, validity, and amount of the claims, "thoroughly research[ing]" whether coverage exists, and reporting on his investigation and coverage conclusions to the National Claims Counsel (NCC), in this case Scott McBee. Once the NCC has made a decision on coverage, the FCSR is responsible for preparing reservation of rights or denial of claim letters providing them to the NCC for review and approval before sending. In the event Stewart Title agrees to defend the claims tendered by its insured, as happened here, the FCSR is responsible for providing input on the selection of counsel to represent the insured, and monitoring any litigation and settlement discussions relating to the claims, including "expeditiously creating and transmitting reports to the NCC discussing the

**Memorandum Decision & Order – page 3**

progress made on the resolution of the claims."

In early 2009, the claims grew too voluminous for Holt, and he transferred the FCSR duties to NCC Scott McBee, also an attorney. *See McBee Deposition (Dkt. No. 63-9) at p. 44.* McBee recognized that Holt had not been able to do a full evaluation of the lien claims. *See McBee Deposition (Dkt. No. 63-5) at pp. 194-95.* Holt himself concedes that he did not conduct a "thorough investigation" of the lien claims. *See Holt Deposition (Dkt. No. 63-3) at p. 203.*

McBee therefore decided to hire counsel at the firm of Faegre Baker Daniels LLP ("Faegre") to do "a complete analysis from the beginning" of whether the lien claims were valid, whether they had priority over Credit Suisse's mortgage, and whether they should be challenged in court or settled. *See McBee Deposition, supra at pp. 195-97.* The record contains a detailed factual analysis of the lien claims done by Faegre attorneys or paralegals. *See Answers to Interrogatories (Dkt. No. 66-2) and attached Exhibit 309.*

At the same time, litigation counsel from Fabian Clendenin – Bruce Badger – was also evaluating the lien claims as part of his representation of Credit Suisse. *Id.* at p. 197. McBee recalled that Badger gave his evaluations to Faegre attorneys who in turn communicated their analysis to McBee. *Id.* at p. 197. McBee would then make a recommendation to his superiors at Stewart Title as to whether the lien claims should be challenged or settled. *McBee Deposition (Dkt. No. 63-9) at p. 46.* When McBee received authorization, he would pass that along to Faegre's counsel who would pass it along to Badger, who was doing the actual negotiating with the lien claimants. The record

**Memorandum Decision & Order – page 4**

contains numerous communications between Faegre counsel Dirk deRoos and Badger over the settlement of lien claims.  *See Deposition Exhibits (Dkt. No. 63-9).*

At the same time that attorneys at Faegre were working closely with Badger in his defense of Credit Suisse, they were also evaluating for Stewart Title whether Credit Suisse was covered by Stewart Title's policy.  McBee had hired Faegre to evaluate coverage issues, and the firm identified reasons for denying coverage to Credit Suisse for some liens.  *McBee Deposition (Dkt. No. 64-6)* at p. 37.  The record contains a series of letters from Faegre attorneys to Credit Suisse's counsel starting in 2009 that raised various questions about whether Stewart Title's policy covered Credit Suisse for certain lien claims.  *See Letters (Dkt. Nos. 63-13, -14).*

On May 11, 2011, the trial court ruled that most of the lien claims had priority over Credit Suisse's mortgages.  About a week later, on May 17, 2011, Faegre sent a letter to Credit Suisse on behalf of Stewart Title denying coverage for the lien claims just adjudicated against Credit Suisse, and withdrawing Stewart Title's defense of Credit Suisse in the foreclosure action.  The next day, May 18, 2011, Stewart Title filed this lawsuit seeking a declaratory judgment that it owed no duty to defend Credit Suisse.

In response, Credit Suisse counterclaimed that Stewart Title, fraudulently and/or in bad faith, directed and controlled the defense and settlement of the lien claims.  In particular, Credit Suisse asserts that Stewart Title reached the decision to deny coverage for certain lien claims but did not timely inform Credit Suisse of that decision.  Instead, Credit Suisse asserts, Stewart Title continued to direct the defense and settlement strategy

**Memorandum Decision & Order – page 5**

for the lien claims to its advantage and Credit Suisse's detriment.

To pursue its counterclaim, Credit Suisse requested documents related to Stewart Title's investigation of the lien claims and its decisions about coverage, defense, and settlement of those claims. Credit Suisse argues that these documents are highly relevant to their counterclaim that Stewart Title handled the defense of the lien claims in bad faith.

Stewart Title refused to produce certain documents – identified in a privilege log – that it alleges are protected by the attorney-client privilege and/or the work product doctrine. The withheld documents fall into two categories. The first category – referred to as "internal documents" – consists of Stewart Title's own evaluation of the lien claims. Such records include memoranda and correspondence among the Stewart Title employees handling the lien claims from the time they were tendered to when this action was initiated. A second category – referred to as "outside documents" – consists of documents prepared by Faegre attorneys, including their communications with Stewart Title.

The Court will resolve these claims of privilege after reviewing the law governing privilege and work product.

## LEGAL STANDARDS

The party seeking to withhold documents from discovery on the basis of privilege and work product – Stewart Title – has the burden of proving that those doctrines apply to the documents in question. *See In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007). The attorney client privilege is governed by Idaho law. *See Fed.R.Evid. 501*. The

**Memorandum Decision & Order – page 6**

applicable Idaho rule is Idaho Rule of Evidence 502 that provides a privilege for, among other things, "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client which were made . . . between the client or the client's representative and the client's lawyer . . . ."

The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice as well as an attorney's advice in response to such-disclosures. *See United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996). The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). That a person is a lawyer does not make all communication with that person privileged. *Id*.

The work product doctrine, codified in Rule 26(b)(3), protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004). Such documents may only be ordered produced upon an adverse party's demonstration of "substantial need [for] the materials" and "undue hardship [in obtaining] the substantial equivalent of the materials by other means." *See Rule 26(b)(3)*.

### ANALYSIS

**Attorney/Client Privilege**

Just last month, the Washington Supreme Court issued a well-reasoned decision concerning the extent of the attorney/client privilege in bad faith cases. *See Cedell v.*

**Memorandum Decision & Order – page 7**

*Farmers Insurance Co. of Washington*, 295 P.3d 239 (Wash.Sup.Ct. 2013). In that case, plaintiff Cedell filed a claim with Farmers Insurance after his home burned down. Farmers hired attorney Ryan Hall to provide coverage advice and also to investigate the claim. Thus, attorney Hall was providing the same combination of services that Faegre attorneys provided to Stewart Title in this case.

In *Cedell*, Farmers delayed paying the claim, prompting Cedell to sue them for bad faith. In discovery, Cedell sought to compel production of communications between Farmers and attorney Hall. Farmers objected on the ground of privilege, claiming that attorney Hall was retained to give legal advice on coverage issues. That is the same situation faced here.

The Washington Supreme Court, sitting en banc, rejected Farmers' broad claim of privilege. The court began its analysis by discussing what information the insured needs to pursue his bad faith action:

> The insured needs access to the insurer's file maintained for the insured in order to discover facts to support a claim of bad faith. Implicit in an insurance company's handing of claim is litigation or the threat of litigation that involves the advice of counsel. To permit a blanket privilege in insurance bad faith claims because of the participation of lawyers hired or employed by insurers would unreasonably obstruct discovery of meritorious claims and conceal unwarranted practices.

*Id*. at 244-45. Because of this need, the court held that the insured is entitled "to broad discovery, including, presumptively, the entire claims file." *Id*. at 247. More specifically, "[w]e start from the presumption that there is no attorney-client privilege relevant between the insured and the insurer in the claims adjusting process . . . ." *Id*. at

**Memorandum Decision & Order – page 8**

246. The insurer may overcome the presumption of discoverability by showing that "its attorney was not engaged in the quasi-fiduciary tasks of investigating and evaluating or processing the claim, but was instead providing the insurer with counsel as to its own potential liability; for example, whether or not coverage exists under the law." *Id.* "Upon such a showing, the insurance company is entitled to the redaction of communications from counsel that reflected the mental impressions of the attorney to the insurance company, unless those mental impressions are directly at issue in their quasi-fiduciary responsibilities to their insured." *Id.*

In the present case, Faegre performed the same mixed role that attorney Hall performed in *Cedell*. At times, Faegre was providing coverage advice to Stewart Title, and at other times it was investigating claims alongside Credit Suisse's counsel from Fabian Clendenin. When counsel are providing such mixed services, the Washington Supreme Court wisely counseled that "insurers may wish to set up and maintain separate files so as not to comingle different functions." *Id.* at 246 n. 5.

Stewart Title apparently did not set up such separate files because it appears from the privilege log that coverage communications may be mixed together with unprivileged claim investigation communications. And as *Cedell* makes clear, not all coverage communications are protected but only those that have no relevance to Credit Suisse's bad faith claims.

There is no Idaho Supreme Court decision addressing the issues faced by *Cedell*. Where "the state supreme court has not spoken on an issue, [the Court] must determine

**Memorandum Decision & Order – page 9**

what result the [state supreme court] would reach based on state appellate court opinions, statutes and treatises." *Evanston Ins. Co. v. OEA, Inc.,* 566 F.3d 915, 921 (9th Cir. 2009). While no Idaho opinions or treatises offer guidance, there is a clue in Idaho's Joint Client exception to the attorney/client privilege found in Idaho Rule of Evidence 502(d). It states that "there is no privilege under this Rule . . . [a]s to a communication relevant to a matter of common interest between or among two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients." While no published Idaho decision applies this exception in a bad faith action, nearly identical language has been applied to bad faith actions by other authorities. For example, a leading treatise reaches that result by interpreting a proposed Federal Rule of Evidence – never adopted – that is nearly identical to Idaho's Rule of Evidence 502(d)(5).[1]  *See* 24 Wright and Graham, *Federal Practice and Procedure*, § 5505 (1986). This treatise concludes that the Joint Clients exception was specifically designed to apply to first party bad faith actions between an insured and an insurer. *Id.* at p. 551. In those cases, the insured and the insurer are joint clients: "Typically in the insured-insurer relationship, the attorney is engaged and paid by the carrier to defend the insured and therefore operates on behalf of the two clients." *Lexington Insurance Company v. Swanson*, 240 F.R.D. 662, 667 (W.D. Wash. 2007)

---

[1] The only difference between the unapproved federal rule and Idaho's Rule 502(d)(5) is that the Idaho Rule adds the words "or among" after the word "between" in identifying that the exception applies to communications "between *or among* two or more clients." The difference is insignificant to the issues here.

**Memorandum Decision & Order – page 10**

(quoting *Barry v. USAA*, 989 P.2d 1172 (Wash.App.Ct. 1999)). In those situations, where the insured brings a bad faith action, the courts have rejected claims that communications between the insurer and the attorney it hired to represent the insured are privileged. *Id*; *see also* Wright and Graham, *supra* at § 5474 at pp. 122-23 (concluding that "[a]n increasing number of cases have adopted this rationale" and that it is the favored view).

Idaho's Joint Client exception would most clearly apply to communications between Stewart Title and the attorneys at Fabian Clendenin, retained to represent Credit Suisse. And where Faegre attorneys worked alongside Fabian Clendenin attorneys to investigate lien claims, the Joint Client exception would also apply. At any rate, Idaho's Joint Client exception aligns with the holding in *Cedell*, and demonstrates that if the Idaho Supreme Court were faced with the facts of this case, they would apply the holding in *Cedell* to resolve the case.

Under *Cedell's* analysis, Credit Suisse is presumptively entitled to Stewart Title's entire claims file. Stewart Title may overcome this presumption by identifying – in camera – documents and/or communications where Faegre was not engaged in the quasi-fiduciary tasks of investigating and evaluating the claim. Upon such a showing, Stewart Title "is entitled to the redaction of communications from [Faegre] that reflected the mental impressions of [Faegre] to [Stewart Title], unless those mental impressions are directly at issue in their quasi-fiduciary responsibilities to [Credit Suisse]." *Id.*

At oral argument, Stewart Title argued that *Cedell* should not be applied to title insurance cases because, as a matter of law, a title insurance company owes no quasi-

**Memorandum Decision & Order – page 11**

fiduciary duty to its insured.  Stewart Title cited no cases so holding, and in any event, this argument is more properly raised in a dispositive motion.[2]

Consequently, the Court will direct Stewart Title to review the thousands of pages of documents in the challenged documents – that is, the documents identified as the "inside documents" and the "outside documents" – and submit to the Court for an in camera review those documents that Stewart Title alleges are protected.  The Court will review those documents in camera and determine, under the standards enunciated above, which should be protected and which should be disclosed.

To give Stewart Title some guidance, the Court expects the vast majority of the "internal documents" to be produced to Credit Suisse and not forwarded to the Court for in camera inspection.  The "external documents" that Stewart Title seeks to protect may be more numerous, but even so, many of them should be turned over to Credit Suisse.  All documents dealing with the factual investigation of the lien claims are discoverable.  Documents that discuss both coverage and factual matters are similarly discoverable, although their coverage discussion is subject to redaction if it has nothing to do with the bad faith claim.

At any rate, the Court expects Stewart Title to submit to the Court only those documents where coverage issues are discussed.

---

[2] After the oral argument, Stewart Title e-mailed case citations to the Court and counsel, but none of them hold that a title insurance company owes no quasi-fiduciary duties to its insured.

**Memorandum Decision & Order – page 12**

**Work Product**

As set forth above, the source of the work product doctrine is Federal Rule of Civil Procedure 26(b)(3). Under that Rule, "opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling." *Holmgren v. State Farm Mutual Automobile Ins. Co.*, 976 F.2d 573, 577 (9th Cir.1992).

Both elements are met here. "In a bad faith insurance claim settlement case, the strategy, mental impressions and opinion of [the insurer's] agents concerning the handling of the claim are directly at issue." *Id*. (internal quotations omitted). There is no other way for Credit Suisse to get this information as it is solely in the possession of Stewart Title. *See Ivy Hotel San Diego, LLC v. Houston Cas. Co.,* 2011 WL 4914941 (S.D.Cal. Oct. 17, 2011) (holding that compelling need existed for producing work product in bad faith case where information was in "exclusive control" of insurer and insured had "no other way to probe reasons [insurer] denied [the insured's] claim").

**Conclusion**

The Court will grant in part and reserve in part the motion to compel. The Court will grant that portion of the motion seeking a ruling that the work product doctrine does not protect the documents at issue here. The Court will reserve ruling on the attorney/client privilege issues pending an in camera review to be conducted pursuant to the standards set forth above.

**ORDER**

**Memorandum Decision & Order – page 13**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to compel (docket no. 61) is GRANTED IN PART AND RESERVED IN PART. The Court will grant that portion of the motion seeking a ruling that the work product doctrine does not protect the documents at issue here. The Court will reserve ruling on the attorney/client privilege issues pending an in camera review of documents to be conducted pursuant to the standards set forth in the Memorandum Decision set forth above.

IT IS FURTHER ORDERED, that within thirty (30) days from the date of this decision, Stewart Title shall review the documents it is withholding and produce to Credit Suisse those documents that are discoverable under the standards set forth above, and submit to the Court for an in camera review only those documents that are truly in dispute.

DATED: **April 3, 2013**

Honorable B. Lynn Winmill
Chief U. S. District Judge