UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEWART TITLE INSURANCE COMPANY, a Texas corporation,<br><br>                            Plaintiff,<br><br>            v.<br><br>CREDIT SUISSE, Cayman Islands Branch,<br><br>                            Defendant. | Case No. 1:11-cv-227-BLW<br><br><br>**MEMORANDUM DECISION & ORDER** |

## INTRODUCTION

The Court has before it a motion for partial summary judgment and a motion to amend to add a claim for punitive damages, both filed by defendant Credit Suisse. The Court heard oral argument on June 26, 2013, and the motions are now at issue. For the reasons described below, the Court will grant the motion to amend to add a claim for punitive damages, and grant in part the motion for partial summary judgment.

## SUMMARY

Defendant Credit Suisse loaned $250 million to Tamarack Resort, LLC to build a ski resort. Credit Suisse secured its loan with two mortgages on the resort property, and obtained title insurance from Stewart Title. With the resort only partially completed, Tamarack defaulted on the loan, leaving most of the contractors unpaid. The contractors filed liens on the resort property, and those liens were later determined to be superior to

Credit Suisse's two mortgages.  Stewart Title filed this action seeking a declaratory judgment that it is not required by the title insurance policy to indemnify Credit Suisse for any loss due to these superior liens.

In the pending motions, Credit Suisse challenges Stewart Title's reliance on the policy's exclusions to avoid coverage, and seeks to add a claim for punitive damages. The Court will take up the pending motions after first reviewing the factual background of this litigation.

## FACTUAL BACKGROUND

On May 19, 2006, Tamarack and Credit Suisse signed a Credit Agreement setting forth the Loan of $250 million from Credit Suisse to Tamarack to build a ski resort.  The Loan was secured by two mortgages on most of the 3,608 acres on which the resort was to be built.  On the same day the Loan was issued, Stewart Title, through its subsidiary, AmeriTitle, issued Credit Suisse a lender's title insurance policy ("the Policy") on the mortgaged land.  The Policy was worth $227,000,000.00 and did not contain the standard exceptions for mechanics' liens and creditors' rights.

Before the Credit Agreement was signed, Credit Suisse and Stewart Title negotiated over the terms of the Policy.  On April 20, 2006, Stewart issued a "Commitment to Provide Title Insurance," which functioned as a draft of the Policy. Between issuing the Commitment and issuing the Policy, Stewart and Credit Suisse negotiated Schedule B, the list of specific exclusions to the Policy.  Stewart also requested an appraisal of Tamarack from Credit Suisse and the list of accounts payable from the Loan documents.  Credit Suisse gave Stewart an appraisal that another firm –

Cushman & Wakefield – had prepared for financing purposes.  Credit Suisse also directed Stewart to communicate with Tamarack to obtain the Schedules from the Loan documents.

Tamarack had contracted with multiple builders and architects to begin construction on portions of the resort prior to May 19, 2006.  Notably, Banner/Sabey II, LLC, a general contractor, had begun construction of the Village Plaza in early April of 2006.

This becomes important because under Idaho law a contractor who has not been paid can file a mechanic's lien that attaches to the real property and takes priority over liens or mortgages that attached after the date the contractor began the work at issue.  Thus, a company providing title insurance has a vested interest in knowing the date contractors began work on a project and whether that date is prior in time to any mortgages covered by the title insurance.

Stewart obtained lien waivers from some, but not all, of the contractors prior to issuing the Policy.  Banner/Sabey II and MHTN, the architect of the Village Plaza project, did not sign waivers until several months after the Policy was issued. Banner/Sabey II had signed a contract with Tamarack in March of 2006, but had made the contract contingent on financing, which came in the form of Credit's Suisse's Loan. The Loan documents reflected this fact: at the time the Loan and Policy were issued Banner/Sabey II and MHTN were listed under Schedule 2.9, the accounts payable schedule, but were not listed under Schedule 1.1(e), the list of contractors, or Schedule 4.33, the list of material contracts.

**MEMORANDUM DECISION AND ORDER** - 3

The Loan was set to mature on May 19, 2011.  Long before that date, however, Tamarack defaulted on the Loan.  Credit Suisse filed a foreclosure action in Idaho state court and tendered to Stewart Title the defense against multiple competing liens.

Stewart Title accepted the tender and defended Credit Suisse in the state court foreclosure action.  On May 1, 2009, the state court held that the lien waivers signed by Banner/Sabey II and other contractors only waived the right to a lien for work performed before the Loan documents were recorded, but not for later performed work.

On June 29, 2009, Stewart withdrew its defense of Credit Suisse against a vendee's lien held by BAG Property Holdings, LLC.  On May 11, 2011, the state court entered findings concluding that certain mechanics' liens worth around $13 million were valid and had priority over Credit Suisse's mortgages.  On May 17, 2011, Stewart withdrew its defense of Credit Suisse against these mechanics' liens and, on the next day filed this lawsuit.  Stewart generally seeks a declaration that it does not need to indemnify Credit Suisse for any loss due to these superior mechanics' and vendees' liens.

In a motion now before the Court, Credit Suisse seeks summary judgment that: (1) The Policy affords coverage for mechanics' liens ; (2) The Policy may not be rescinded or voided under I.C. § 41-1811 for Credit Suisse's alleged fraud; (3) The Policy affords coverage for the statutory BAG vendee's liens; (4) Exclusion 3(a) is inapplicable; (5) Exclusion 3(b) is inapplicable; (6) Stewart Title's common law fraud claim fails as a matter of law; (7) The Policy cannot be terminated for Credit Suisse's failure to provide a proof of loss; (8) The Policy cannot be terminated due to impairment of subrogation rights; (9) The Policy cannot be terminated due to Credit Suisse's failure to provide

requested information; and (10) Stewart Title breached its duty to defend Credit Suisse against the mechanics' liens and BAG vendee's liens.  The Court will address each of these claims.

## ANALYSIS

### Mechanic's Lien Coverage

The Policy provides that Stewart would protect Credit Suisse "against loss or damage . . . sustained or incurred by the insured by reason of . . . lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material."  *See Policy (Exhibit 79)* at p.1.  This coverage is made subject to any separate exclusion or exception that may be applicable.  *Id.*

The mechanic's liens claimed by Banner/Sabey II and MHTN are statutorily created by § 45-501 of the Idaho Code.  The clear language of the Policy, quoted above, covers mechanic's liens, like those held by Banner II and MHTN, subject to the separate provisions in the Policy on Exclusions and Exceptions.  Credit Suisse is entitled to a partial summary judgment on this issue.

### Fraud

In its complaint, Stewart Title accuses Credit Suisse of fraud and seeks on that basis to rescind the Policy.  Under Idaho law, a court may annul an insurance policy if it finds that the insured misrepresented, omitted, or concealed facts that were consequential to the risk insured against.  *See* Idaho Code § 41-1811.  Under this statute, a misrepresentation, omission, or concealment by an insured will not prevent recovery unless (a) it was made fraudulently; (b) it was "material to the acceptance of the risk;" or

(c) the insurance company would not have issued the policy had it known of the misrepresentation, omission or concealment.  *Id.*

The statute "describes the only circumstances in which a contract for insurance is voidable." *Robinson v. State Farm*, 45 P.3d 829, 837 (Id.Sup.Ct. 2002).  Thus, to the extent that Stewart is relying on any common law claim of fraud apart from Idaho Code § 41-1811, those assertions must be stricken.

Stewart argues that Credit Suisse made two material misrepresentations that amount to insurance fraud under Idaho law.  First, Stewart argues that Credit Suisse provided a misleading appraisal, intending to deceive Stewart into issuing the Policy. Second, Stewart argues that Credit Suisse knew, but failed to reveal, facts that gave priority to mechanic's liens filed by contractors Banner/Sabey II and MHTN over Credit Suisse's mortgages, and that this failure deceived Stewart into agreeing to cover those mechanics' liens in the Policy.

**Fraud – Appraisal**

Stewart argues that Credit Suisse provided a misleading appraisal of Tamarack Resort's value "with the intent to induce Stewart to issue a lender's title policy without standard exceptions for creditors' rights claims and mechanics liens." *Complaint (Dkt. No. 1)* at ¶¶ 18-21.  Stewart argues that it would not have issued the Policy if it had known the "the true facts about the nature of the Appraisal." *Id*. at ¶ 57.  Stewart also argues that Credit Suisse concealed another appraisal it had in its possession that accurately assessed the fair market value of Tamarack.

A title insurance company, like any other type of insurance company, is permitted to seek information from an insurance applicant in order to assess the risk it is assuming. When assessing risk, the insurer frames the questions it asks of an applicant, and is responsible for the clarity of those questions. *See Wardle v. Int'l Health & Life Ins. Co.,* 551 P.2d 623, 626 (Id.Sup.Ct. 1976). Any ambiguity in the questions will be construed against the insurer. *Id.* The insurer is not limited to an initial set of inquiries; ambiguous responses by the applicant may, and should, prompt follow-up questions by the insurer to clarify the responses. *Transamerica Premier Ins. Co. v. Miller*, 41 F.3d 438, 442 (9th Cir. 1994) ("[A]n insurer's issuance of a policy in the face of what appears to be a lack of sufficient information to allow the insurer to determine its risks estops the insurer from, or waives the insurer's right to, cite that lack of information as a ground for avoiding coverage"). The applicant has a corresponding duty to answer the insurer's questions in good faith. *Wardle,* 551 P.2d at 626. When deciding whether an applicant has met this responsibility, a court must determine whether the applicant reasonably could have been expected to understand that it was required to disclose certain information in response to the direct question posed by the insurer. *Id.*

Here, there was no contractual requirement for Credit Suisse to provide an appraisal to Stewart Title in order to obtain title insurance. Credit Suisse provided the appraisal in response to a simple request by Stewart Title, through its agent AmeriTitle, in an email sent May 4, 2006. *See E-mail (Dkt 88-2).* The email asked, "Do you have a current appraisal?" In response, Credit Suisse sent AmeriTitle, via Federal Express on May 4, 2006, a copy of the appraisal prepared for them by Cushman and Wakefield in

April of 2006.  *See Transmittal Letter (Dkt. No. 71-36)*.  Credit Suisse's transmittal letter simply stated, "As you requested, enclosed is a copy of the appraisal of Tamarack."  *Id.*

The Appraisal itself states "[t]he function of the report is for financing."  It states that it can be relied upon by (1) "any qualified institutional buyer," (2) "accredited investor," (3) "Rating Agency," or (4) "other lender in determining whether to purchase all or a participating interest in loans secured by the property."  *See Appraisal (Dkt. 71-37) at p. 2.*  The Appraisal does not represent that it can be relied upon by a title insurance company.

Moreover, the Appraisal is clear that its purpose is to estimate the "Total Net Value" of the Tamarack Resort.  *See Appraisal (Dkt. 71-37) at pp. 2, 4.*  It specifically warns that "[t]his is not the Market Value of the property."  *Id.*  The Appraisal defines Total Net Value "as the sum of the market value of the bulk lots of the entire planned community, as if all of the bulk lots were complete (in terms of backbone and infrastructure) and available for sale to merchant builders."  *Id.* at 14.

Stewart now argues that the "Total Net Value" figure estimated by the Appraisal -- $824 million – "is wildly inaccurate and had nothing to do with the market value of the [Tamarack Resort] Project at any time."  *See Stewart Brief (Dkt. No. 87) at p. 7.*  Stewart cites to the reports of its experts concluding that "the term 'Total Net Value' is misleading because it is an "unfamiliar term defined in a confusing manner without any reference or source."  *Id.* at p. 8.  Stewart accuses Credit Suisse of not providing a more accurate appraisal – that estimated the market value to be $284 million – despite having it

in their possession.   These circumstances, Stewart argues, create a genuine issue of material fact on the fraud claim that precludes summary judgment.

The Court disagrees.  The Appraisal clearly states, as quoted above, that it is not estimating current market value and is to be used for financing purposes.  Credit Suisse made no representation to Stewart about the Appraisal, and so Stewart cannot argue that it was misled by anything other than the language of the Appraisal.  If that language was confusing – as Stewart's experts assert – the case law cited above put the burden on Stewart to ask clarifying questions.  It failed to do so, and therefore waived its right to object now.  *See generally Wardle*, 551 P.2d at 628 (holding that failure of insurer to ask clarifying questions about heart murmur precluded claim that nondisclosure of that condition was misleading under I.C. § 41-1811).

This conclusion is not altered by Credit Suisse's failure to provide Stewart with another appraisal that Credit Suisse had in its possession.  That appraisal was prepared not for Credit Suisse but for SG Americas Securities LLC.  *See Draft Appraisal (Dkt. No. 88-12).*  Moreover, the appraisal states on the front page that it is only a "Draft" – there is no indication in the record that Credit Suisse had a final version in its possession at the time Stewart asked for an appraisal.

The Court will therefore grant Credit Suisse's motion for partial summary judgment to the extent it seeks to preclude Stewart from rescinding the Policy based on the Appraisal Credit Suisse did provide or on the appraisal that it did not provide.

**<u>Fraud – Knowledge of the Contractors</u>**

Credit Suisse seeks partial summary judgment that it did not commit fraud by failing to reveal that Banner/Sabey II  and MHTN had started work prior to the issuance of the Policy, giving them liens superior to Credit Suisse's two mortgages.  Stewart responds that there are at least questions of fact concerning its claim that Credit Suisse's failure was intended to mislead Stewart into issuing a Policy that it would not have issued if Credit Suisse had revealed its knowledge.

In Idaho, a mechanic's lien attaches to a piece of property when the contractor begins work or first furnishes materials.  *Ultrawall, Inc. v. Washington Mut. Bank FSB,* *25 P.3d 855. (Id.Sup.Ct 2001).*  Here, Banner/Sabey II was the general contractor for the construction of the Village Plaza II project, and MHTN was the architect.  In the foreclosure action discussed above, the Idaho state court found that both began work prior to the recording of Credit Suisse's mortgages and thus had priority over those mortgages.

 If Stewart knew, or should have known, that these two entities had started work before the mortgages were recorded and the Policy was issued, Stewart cannot rescind the Policy for Credit Suisse's failure to reveal that same knowledge.  When "an insurance company has knowledge of facts which would justify a rescission of the policy at the time the policy is issued, but takes no steps to rescind it, the company waives the right later to insist upon those facts in avoidance of the policy." *Indus. Indem. Co. v. U. S. Fid.* *& Guar. Companies*, 454 P.2d 956, 960 (Id.Sup.Ct. 1969).  Even partial knowledge can put an insurer on notice that it should inquire further, and it will be deemed to have

knowledge of those facts that "an inquiry pursued with ordinary diligence and understanding would have disclosed." *Id.* at 961.

It is undisputed that before issuing the Policy, Stewart had been told by Tamarack's Controller Rod Mourant, and by Tamarack's CFO, Jonathan Zurkoff, that Banner/Sabey would be the general contractor on the Village Plaza II project but that the contract was not yet final. *See Cole Deposition (Dkt. No. 71-2)* at pp. 107-08. Stewart also knew that "some money was owed on the Village as there was some construction onsite," and that "Banner/Sabey was owed money . . . ." *Id.* at p. 281-82. On the day before the Policy was issued, Anne Griffith, Tamarack's attorney, emailed Stewart the final schedules to the Credit Agreement. *See E-mails (Dkt. No. 71-43).* While Banner/Sabey II and MHTN were not listed on the schedule of contractors, they were listed on the accounts payable schedule, showing that Banner/Sabey II was owed $589,386.77 and MHTN was owed $1,031898.84. *See Schedule 2.9 (Dkt. No. 71-43)* at p. 4.

There may be some question as to whether Stewart actually knew that the contractors had begun work by a certain date. But there is no question that the undisputed facts listed above put Stewart on inquiry notice. A diligent inquiry would have revealed what work was done and when that work started, crucial facts that would give any mechanic's lien based on that work priority over the two mortgages. Stewart must be held to knowledge of these facts, and thus cannot claim that Credit Suisse committed fraud by failing to reveal the same facts. S*ee Indus. Indem,* 454 P.2d at 961.

Stewart argues, however, that Credit Suisse had a duty under the Commitment to notify Stewart of its knowledge that work had begun early.  That Commitment states as follows:

> If [Credit Suisse] has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereof covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to [Stewart] in writing, [Stewart] shall be relieved from liability for  any loss or damage resulting from any act of reliance hereon to the extent [Stewart] is prejudiced by failure to so disclose such knowledge.

*See Commitment (Dkt. No. 81-19)* at p. 5.  This provision does not save Stewart's fraud claim.  It applies only when Stewart Title is "prejudiced" by Credit Suisse's failure to disclose its knowledge about liens.  A party cannot be "prejudiced" by an opponent's failure to reveal facts of which the party is aware.  Because Stewart is on inquiry notice of the facts regarding what work was done and when it started, Stewart was not prejudiced by any failure of Credit Suisse to reveal its own knowledge of those same facts, and hence the provision is inapplicable.

### Conclusion on Stewart's Fraud Claim

For the reasons expressed above, the Court will grant Credit Suisse's motion for partial summary judgment precluding Stewart from relying on Idaho Code 41-1811(b) or a common law fraud claim to rescind the Policy.

### Applicability of the 3(a) Exclusion

Credit Suisse next seeks to dismiss Stewart's claim that the Policy does not cover the mechanic's liens held by Banner/Sabey II and MHTN because they fall under exclusion 3(a) of the Policy.  Exclusion 3(a) excludes from coverage "defects, liens,

encumbrances, adverse claims or other matters . . . created, suffered, assumed or agreed to by the insured claimant." *See Policy (Dkt. No. 71-50)* at p. 2.  Stewart argues that Credit Suisse "created" or "suffered" the Banner/Sabey II and MHTN liens because it had knowledge of all the underlying facts which gave rise to the liens.

Exclusion 3(a) is a standard one in title insurance contracts and is "one of the most litigated clauses in the field."  *Home Federal Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732 (7th Cir. 2012) (quoting Palomar, *Title Insurance Law* § 6:10 (2012)).  By excluding coverage when the insured creates a defect in the title, the language "exclude[es] matters that are the insured's own darn fault."  Palomar, *Title Insurance Law, supra,* at § 6:10.  For example, the exclusion applied where an insured created a defect in title by obtaining an equitable lien rather than purchasing the property outright. *Transamerica Title Ins. Co. v. Alaska Fed. Sav. & Loan*, 833 F.2d 775, 776 (9th Cir. 1987).

There is no evidence here that Credit Suisse played any part in the creation of the mechanic's liens filed by Banner/Sabey II and MHTN.  Accordingly, the Court will grant Credit Suisse's motion to dismiss this claim.

## Applicability of the 3(b) Exclusion

Credit Suisse next seeks to dismiss Stewart's claim that the Policy does not cover the mechanics' liens held by Banner/Sabey II and MHTN because they fall under exclusion 3(b) of the Policy.  Exclusion 3(b) excludes from coverage:

> Defects liens, encumbrances, adverse claims or other matters . . . not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to

the Company by the insured claimant prior to the date the insured claimant became an insured under this policy.

*See Policy (Dkt. No. 71-50)* at p. 2.  This provision only applies to defects "not known to [Stewart Title]."  As explained above, Stewart Title was on inquiry notice of the facts that would establish the priority of the mechanic's liens.  Hence, this exclusion is inapplicable.  The Court will therefore grant Credit Suisse's motion for summary judgment on this issue.

**Coverage of the BAG Vendee's Liens**

As part of its motion for partial summary judgment, Credit Suisse seeks declaratory relief establishing that the vendee liens filed by BAG Property Holdings, LLC (referred to as the BAG liens)  are covered by the Policy.  The state court, in the foreclosure proceeding, held that the BAG liens totaling about $2 million had priority over Credit Suisse.  In this lawsuit, Stewart Title claims that the Policy contains an exception that denies coverage for the BAG liens.  Credit Suisse asks the Court to find that the exception does not apply to the BAG liens.

The BAG liens had their origins in an agreement by Tamarack to sell portions of the Project to BAG pursuant to two written contracts.  BAG paid Tamarack $2 million as a deposit under the two contracts.  Tamarack defaulted and BAG asserted vendee's liens under I.C. §45-804 to recover its $2 million deposit.  That statute gives a purchaser a lien for any amount he paid an owner as part of the purchase price where the sale ultimately does not take place:

One who pays to the owner any part of the price of real property, under an agreement for the sale thereof, has a special lien upon the property,

independent of possession, for such part of the amount paid as he may be entitled to recover back, in case of a failure of consideration.

*See* Idaho Code § 45-804.  The statute requires, by its terms, "an agreement for the sale [of the real property]," and BAG based its liens on two recorded documents setting forth the sale terms with Tamarack: (1) a Memorandum of Agreement, and (2) a Notice of Option.  In the state court foreclosure action, BAG claimed that its liens were superior to Credit Suisse's mortgages because BAG's two documents were recorded before the mortgages were recorded.  The state court agreed.  *See State Court Decision (Dkt. No. 71-20)* at pp. 84-99.  The state court concluded that (1) BAG did not waive its liens, (2) BAG's liens had priority over Credit Suisse, and (3) the liens were not barred by the doctrines of equitable-estoppel, quasi-estoppel or unjust enrichment.  *Id.*

In this lawsuit, Stewart Title argues that the Policy excludes coverage for the BAG liens.  Stewart Title points to Schedule B of the Policy that states as follows:

> This policy does not insure against loss or damage . . . which arise by reason of . . . .
> * * *
> 103. MEMORANDUM OF AGREEMENT between Tamarack Resort, LLC . . . and Bayview Financial, L.P.
> * * *
> 106. NOTICE OF OPTION AGREEMENT, between Tamarack Resort, LLC . . . and Bayview Financial, L.P.

*See Schedule B (Dkt. No. 71-50).*  In its complaint, Stewart Title seeks a declaratory judgment that this provision excludes coverage for the BAG liens, which "arise by reason of" the two recorded agreements listed there.

Credit Suisse now seeks a partial summary judgment denying this declaratory relief.  Credit Suisse argues that because the state court relied on Idaho

Code § 45-804 to uphold the validity of the BAG liens, those liens "arose by reason of" the statute, not by reason of the instruments listed in Schedule B. Credit Suisse also argues that the language of Schedule B is ambiguous because it says nothing about Idaho Code § 45-804, and that this ambiguity must be construed against the insurer and in favor of coverage.

"Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact." *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285,* *148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010)* (citations omitted). A Court should find a specific policy provision ambiguous if "it is reasonably subject to conflicting interpretations." *City of Boise v. Planet Ins. Co.*, 878 P.2d 750, 755 (Idaho 1994).

Here, the language is not ambiguous. The exception covers any loss that arises by reason of the two agreements. The BAG liens arose by reason of the two agreements. The statute creating the legal basis for the lien – Idaho Code § 45-804 – requires "an agreement for the sale [of the real property]." The two agreements were thus indispensable to the creation of the statutory liens; no liens would have arisen without them. Thus, the liens arose by reason of the two agreements; the language of the exception is not "reasonably subject to conflicting interpretations." *City of Boise*, 878 P.2d at 755. . The Court will accordingly deny Credit Suisse's motion for partial summary judgment on this issue.

## <u>Absence of a Proof of Loss</u>

Credit Suisse next seeks summary judgment on Stewart's claim that Credit Suisse failed to provide a proof of loss. Stewart's complaint seeks a judicial declaration "[t]hat

Credit Suisse's claims for defense and indemnity under the Policy are excluded or not covered because there is no proof of loss or damage." *See Complaint (Dkt. No. 1)* at ¶51(d).  The Policy requires Credit Suisse to provide Stewart Title with a "signed and sworn to" proof of loss or damage and to "describe the defect in, or lien or encumbrance on the title, or other matter . . . which constitutes the basis of loss or damage." *See Policy (Dkt. No. 71-50)* at p.3 ¶ 5.  Stewart argues Credit Suisse has not met this requirement of the policy because they have provided no proof of actual loss, as required by the Policy. Until a foreclosure sale is held, and the amount received for the real property is established, Credit Suisse has not actually suffered any loss, Stewart argues.

That requirement, Stewart argues, is contained in Section 8(b):

> In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there been a final determination by a court of competent jurisdiction and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

*See Policy (Dkt. No. 71-50)* at p. 4.[1]  It is true, as Stewart claims, that the precise loss cannot be fixed until the foreclosure sale is held, and that sale has recently been delayed once again for a few months.  However, Credit Suisse's expert, Philip Cook, concludes that Credit Suisse has suffered financial losses as a result of Stewart Title's actions.  *See Cook Report (Dkt. No. 102-28).* at ¶¶ 6, 24, 25.  In Cook's opinion, Stewart Title's actions reduced the value of the land and prejudiced Credit Suisse's rights in the

---

[1] Stewart Title cites an unpublished Ninth Circuit case decided in 1997 interpreting a similar provision.  This citation is prohibited by Ninth Circuit Rule 36-3(c).

foreclosure action.  *Id.*  These losses exist regardless of what occurs at the foreclosure sale, according to Credit Suisse.

Given this record, the Court cannot make any definitive ruling on whether Credit Suisse has suffered a loss.  Generally, it is difficult to calculate loss in a case like this until the foreclosure sale takes place.  *Karl v. Commonwealth Land Title Ins. Co.,* 24 Cal.Rptr.2d 912 (Cal.App.1993) ("the earliest a loss can be claimed on a lender's policy is at the time of completion of foreclosure"); s*ee also, Hodas v. First American Title Ins. Co.,* 696 A.2d 1095, 1097 (Me.1997) ("The presence of a title defect immediately results in a loss to the holder of a fee interest since resale value will always reflect the cost of removing the defect. In contrast, the holder of a loan policy incurs a loss only if the security for the loan proves inadequate to pay off the underlying insured debt due to the presence of undisclosed defects.").

Generally Section 8(b) would preclude any finding of liability against Stewart Title until the foreclosure sale took place.  While the expert Cook concludes that Credit Suisse has suffered a loss now, the full extent of the loss will not be known until the foreclosure sale occurs.  This does not stop the law suit from proceeding because coverage issues can be resolved before any liability is assessed, and it is liability not coverage that Section 8(b) addresses.  But the Court cannot make any final determination of liability – and set damages at a sum certain – until the foreclosure is completed.  Accordingly, the Court cannot grant summary judgment on this issue to Credit Suisse at this time.

**Impairment of Subrogation Rights**

Credit Suisse next seeks to dismiss Stewart's assertion "[t]hat in refusing and failing to pursue its remedies against the Guarantors, Credit Suisse forfeited its claims under the Policy." *See Complaint (Dkt. No. 1)* at p. 19.  Credit Suisse argues that there is no basis for this assertion in the Policy, and Stewart did not respond in its briefing or argument.  The Court concludes that Credit Suisse had no duty to pursue Stewart's subrogation rights and will therefore grant summary judgment on this issue.

## Failure to Provide Information

Credit Suisse next seeks to dismiss Stewart's assertion "[t]hat Credit Suisse violated its specific obligation to provide to Stewart all documents, etc. reasonably pertaining to the claimed loss and by such refusal forfeited coverage under the Policy." Complaint Dkt. 1 ¶ 51(k).  Stewart seeks a declaration that Credit Suisse violated paragraph five of the Policy, which provides:

> [T]he insured claimant shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. . . .  Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

*See Complaint (Dkt. No. 71-50)* at p. 3.  Credit Suisse seeks to preclude Stewart Title from relying on this provision in any way.  However, this provision discusses Credit Suisse's obligation to produce material relating to the "loss or damage," and as just

discussed, that is a continuing obligation that has not yet been completed.  For that reason, summary judgment on this issue must be denied.

**Duty to Defend**

Credit Suisse finally seeks to dismiss Stewart's claim that it "has never had and does not have a duty to defend . . . Credit Suisse under the terms of the Policy."  *See Complaint (Dkt. No. 1)* at ¶ 51(i).  Credit Suisse argues that, as a matter of law, Stewart breached its duty to defend by assuming the duty and then dropping it before obtaining a court ruling that there was no coverage.

"The duty to defend arises upon the filing of a complaint whose allegations, in whole or in part, read broadly, reveal a potential for liability that would be covered by the insured's policy."  *Hoyle v. Utica Mut. Ins. Co.,* 48 P.3d 1256, 1260-61 (Id.Sup.Ct. 2002).  So long as "an arguable potential exists for a claim covered by the policy . . . the insurer must . . . defend the suit."  *Id*. at 1261 (quoting *Kootenai County v. W. Cas. and Sur. Co.,* 750 P.2d 87, 89 (Id.Sup.Ct. 1988)).

Credit Suisse argues that once an insurer begins to defend – as Stewart Title did here – it cannot later drop the defense until a court determines that no coverage exists.  Credit Suisse cites no Idaho case so holding.  Indeed, *Hoyle* suggests just the opposite:  It holds that when "there is no potential for coverage" the insurer is not required to "tender a defense until the lack of coverage is established."  *Id*. at 1260.

This case law requires an insurer to provide a defense so long as an "arguable potential" for coverage exists.  *Id.* at 1261.  When no "arguable potential" for coverage exists, the insurer is free to drop its defense.  *Id.*  Credit Suisse's argument that an insurer

is locked into defending its insured once it assumes a defense until a court rules on coverage issues is not supported by the case law it cites.  Accordingly, the Court will deny Credit Suisse's motion on this issue.

## Conclusion on Credit Suisse's Motion for Partial Summary Judgment

The Court will therefore grant in part Credit Suisse's motion for summary judgment.  The Court will grant the motion to the extent it seeks a ruling, as a matter of law, that (1) subject to the provisions for Exceptions and Exclusions, the Policy covers the mechanic's liens filed by Banner/Sabey II and MHTN; (2) Stewart Title cannot raise as a defense to coverage that Credit Suisse committed fraud; (3) Stewart Title cannot raise as a defense to coverage the provisions of Exclusions 3(a) and 3(b); and (4) Stewart Title cannot raise as a defense to coverage Credit Suisse's failure to pursue its remedies against Guarantors.

The Court will deny Credit Suisse's motion to the extent it seeks a ruling, as a matter of law, that:  (1) The BAG Vendee's Liens are covered by the Policy; (2) Stewart Title cannot raise as a defense Credit Suisse's failure to provide proof of loss; (3) Stewart Title breached its duty to defend.

## Credit Suisse's Motion to Amend to Add Claim for Punitive Damages

The Court turns next to Credit Suisse's motion to amend its counterclaim to include a claim for punitive damages.  Whether a party should be allowed to amend a pleading to seek punitive damages is a substantive question controlled by Idaho law. *See Doe v. Cutter Biological,* 844 F. Supp. 602, 610 (D.Id. 1994).  The trial court decides, in its discretion, whether to submit the punitive damages issue to the jury. *See Manning v.*

*Twin Falls Clinic & Hosp., Inc.,* 830 P.2d 1185, 1190 (Id.Sup.Ct. 1992).  An award of

punitive damages ultimately requires a bad act and a bad state of mind.  *See Todd v.*

*Sullivan Const. LLC*, 191 P.3d 196, 201 (Id.Sup.Ct. 2008).  The defendant must (1) act in

a manner that was an extreme deviation from reasonable standards of conduct with an

understanding of—or disregard for—the likely consequences, and must (2) act with an

extremely harmful state of mind, described variously as with malice, oppression, fraud,

gross negligence, wantonness, deliberateness, or willfulness.  *Myers v. Workmen's Auto*

*Ins. Co.*, 95 P.3d 977, 983 (Id.Sup.Ct. 2004).

At trial, the party alleging punitive damages must satisfy this standard by clear and

convincing evidence.  *See* Idaho Code § 6–1604(1).  However, for purposes of the motion

to amend, the party seeking to add a claim for punitive damages does not need to meet

this high burden; the party need only show "a reasonable likelihood of proving facts at

trial sufficient to support an award of punitive damages." *See* Idaho Code § 6–1604(2).

The Idaho Supreme Court has laid out five specific factors that play a

determinative role in deciding whether there is sufficient evidence to support a punitive

damages award:  (1) the presence of expert testimony; (2) whether the unreasonable

conduct actually caused harm to the party seeking punitive damages;  (3) whether there is

a special relationship between the parties; (4) proof of a continuing course of oppressive

conduct; and (5) proof of the actor's knowledge of the likely consequences of the

conduct.  *See Cuddy Mountain Concrete Inc. v. Citadel Constr. Inc.*, 824 P.2d 151, 160-

61 (Id.Ct.App. 1992).

In this case, Credit Suisse seeks punitive damages because Stewart Title unreasonably delayed its denial of coverage, preventing a settlement with the lien claimants in the foreclosure action and reducing the value of the land.  Credit Suisse supports these arguments with the affidavits of its experts.  This record, Credit Suisse argues, is sufficient to support a finding that there is a reasonable likelihood that Credit Suisse will be able to prove at trial the requisite extreme deviation from reasonable standards and an extremely harmful state of mind.  The Court will evaluate Credit Suisse's motion in light of the standards discussed above.

**Punitive Damages – Special Relationship**

The special relationship factor between Stewart Title and Credit Suisse is easily established.  Idaho Law acknowledges a special relationship between the insurer and insured that requires the parties to deal in good faith.  *See Cuddy*, 824 P.2d at 160-61. Stewart Title and Credit Suisse were in a special relationship as insurer and insured that required good faith dealings.

**Punitive Damages – Expert Testimony**

Credit Suisse's expert is Albert Rush, a licensed attorney who worked for First American Title Insurance Company from 1982 to 2011.  *See Rush Report (Dkt. No. 102-29)*.  During his time with the company, Rush handled thousands of title insurance claims, including claims in Idaho.  *Id*.  His opinion is that Stewart Title's conduct toward Credit Suisse was "an extreme deviation from reasonable standards of conduct for title insurers."  *Id*. at ¶¶ 18-22.

Stewart Title's expert concludes just the opposite.  In his opinion, Stewart Title acted reasonably in engaging counsel to defend Credit Suisse before determining if the law suits were covered by the insurance policy.  *See Thomson Report (Dkt. No. 91-1) at ¶ 2.*  His opinion is that Rush has made legal conclusions that are inaccurate and fail to conform to Idaho law.  *Id.*

The Court need not resolve the conflicts in the experts' testimony.  It is enough that Credit Suisse's motion to amend is supported by the testimony of an expert.  This factor therefore weighs in favor of granting the amendment.  *See Kuhn v. Coldwell Banker*, 245 P.3d 992, 1004 (Id.Sup.Ct. 2010) (affirming amendment to include punitive damages supported by affidavit of expert).

**Punitive Damages – Actual Harm**

Credit Suisse's expert, Philip Cook, concludes that Credit Suisse suffered financial losses as a result of Stewart Title's actions.  *See Cook Report (Dkt. No. 102-28). at ¶¶ 6, 24, 25.*  More specifically, he opines that Credit Suisse suffered losses as a result of Stewart's failure to settle claims in the foreclosure action, and that Stewart's actions have reduced the value of the land.

Stewart Title responds that the punitive damages claim is unripe until the foreclosure sale takes place.  However, as discussed above, Cook's expert testimony creates questions on this issue.  Accordingly, this issues does not weigh in favor of either party.

**Punitive Damages – Knowledge of the Likely Consequences & Continuous Course of Oppressive Conduct**

As the insurance company, Stewart Title is in a superior position and understands the important financial consequences of failing to defend or indemnify Credit Suisse against the lien claims on the Tamarack property.  *See White v. Unigard Mut. Ins. Co., 730 P.2d 1014, 1018 (Idaho 1986).*   In both first-party and third-party insurance situations the "contract and the nature of the relationship give the insurer an almost adjudicatory responsibility."  *Id.*  The insurer is responsible for evaluating the claim, determining whether the claim falls within the coverage provided, and determines whether to settle or litigate based on the merits. *Id*.  "Although the insured is not without remedies if he disagrees with the insurer, the very invocation of those remedies detracts significantly from the protection or security which was the object of the transaction."  *Id*. Therefore, in insurer/insured cases, there is a presumption that the insurance company has knowledge of the probable consequences of its actions.  *See id.*

Credit Suisse has submitted the opinions of its expert Albert Rush that Stewart Title's conduct was an extreme deviation from the standards associated with title insurance transactions.  *Id.* The Court will briefly summarize his testimony.

First, Stewart Title "had a duty to timely and properly investigate its coverage for claims" from Credit Suisse.  *See Rush Report, supra* at p. 3.  Rush concludes that Stewart Title unreasonably delayed deciding coverage issues, and that this injured Credit Suisse.  *Id*. at ¶ 15.

Second, Stewart Title "had a duty to timely and properly assert any reservation of rights and explain the bases" for that reservation.  *Id.* at ¶ 5.  Stewart Title defended and indemnified Credit Suisse for over a year without asserting any reservation of rights.  *Id*.

Third, Stewart Title "had a duty to settle any of the lien claims for which liability was reasonably clear." *Id.* at ¶ 6. Stewart Title in bad faith did not inform Credit Suisse within a reasonable time of their decision not to settle the Banner/Sabey lien. *Id.* Because Stewart Title did not give equal consideration to Credit Suisse's interests in settling, despite their counsel's recommendation, Stewart Title subjected Credit Suisse to increased financial risk. *Id.*

Fourth, Stewart Title "had a duty to timely file an action for declaratory relief to determine the coverage questions" regarding the liens. *Id.* at ¶ 7. Stewart Title failed to disclose it was evaluating coverage, and when it did determine that the claims were not covered, did not timely communicate this to Credit Suisse. *Id.*

Fifth, "[i]t was improper and unreasonable for Stewart Title to channel all communications between counsel that it retained to represent the insured and principals of the insurer through outside counsel retained by the insurer." *Id.* at ¶¶ 8-9. Faegre Baker, counsel hired by Stewart Title to assist with Credit Suisse's claims, participated in a conference call with Credit Suisse's counsel and then filed the complaint for declaratory judgment to deny coverage under the policy. Rush asserts that counsel cannot both represent the insured and file a complaint against the insured without violating the "relationship of common trust and goals." *Id.*

Sixth, Stewart Title had a duty to "pursue settlement of lien claims as to which Stewart believed it had some coverage defense." *Id.* at ¶ 9. When an insurer agrees to provide a defense for a claim it has the duty to give equal consideration to the interests of the insured and insurer, even if there is a reservation of rights. *Id.* Stewart Title acted in

bad faith, in the opinion of Rush, when it put its own interests ahead of Credit Suisse in refusing to settle the Banner/Sabey claims.  Stewart title knew an adverse decision would result in negative impacts for Credit Suisse in other pending lien claims.  *Id.*  Credit Suisse also alleges Stewart title's denial of coverage was in direct response to this adverse outcome, and Stewart Title had planned to deny coverage from the beginning of the litigation if there was an adverse outcome.  *Id.*

Seventh, once an insurance company "agrees to defend and indemnify [it] may not later change its determination based on facts known to the insurer at the time the insurer so agrees." *Id.* at ¶ 15. Credit Suisse claims that Stewart title had all the necessary information to make the coverage findings at the time the claims were tendered by Credit Suisse. *Id.* at ¶ 7.  Finally, Stewart Title extended an unreasonable offer in bad faith in September 2010.

Given these opinions of Credit Suisse's expert, there is a reasonable likelihood that Credit Suisse can establish that Stewart Title engaged in a continuous course of oppressive conduct and knew of the likely consequences of its actions.

## Weighing All Factors

On the whole, looking at all the factors, the Court finds that they weigh in favor of allowing the amendment.  The Court will therefore grant Credit Suisse's motion and allow the addition of a claim for punitive damages.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Credit Suisse's motion for partial summary judgment (docket no. 68) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks a ruling, as a matter of law, that (1) subject to the provisions for Exceptions and Exclusions, the Policy covers the mechanic's liens filed by Banner/Sabey II and MHTN; (2) Stewart Title cannot raise as a defense to coverage that Credit Suisse committed fraud by providing a misleading appraisal, by not providing another appraisal, and by not revealing its knowledge as to when work began by Banner/Sabey II and MHTN; (3) Stewart Title cannot raise as a defense to coverage the provisions of Exclusions 3(a) and 3(b); and (4) Stewart Title cannot raise as a defense to coverage Credit Suisse's failure to pursue its remedies against Guarantors.  The motion will be denied in all other respects.

IT IS FURTHER ORDERED that Credit Suisse's motion for leave to file an amended counterclaim to assert punitive damages (docket no. 72) is GRANTED.

DATED: August 29, 2013

B. Lynn Winmill
Chief Judge
United States District Court