UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEWART TITLE INSURANCE COMPANY, a Texas corporation,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT SUISSE, Cayman Islands Branch,<br><br>Defendant. | Case No. 1:11-cv-227-BLW<br><br>**MEMORANDUM DECISION & ORDER** |

## INTRODUCTION

The Court has before it seven motions to exclude the testimony of experts. The Court heard oral argument on the motions on June 18, 2015. For the reasons explained below, the Court will (1) grant the motions to exclude the testimony of Jeffrey Thomson and Michael Mason, and (2) grant in part and deny in part the motions to exclude the testimony of Bushnell Nielsen, Robert Reilly, and Albert Rush, and (3) deny the motions to exclude Kenneth Franklin and Philip Cook.

## LITIGATION BACKGROUND

On May 19, 2006, Tamarack and Credit Suisse signed a Credit Agreement setting forth the Loan of $250 million from Credit Suisse to Tamarack to build a ski resort. The Loan was secured by two mortgages on most of the 3,608 acres on which the resort was to be built. On the same day the Loan was issued, Stewart Title, through its subsidiary,

AmeriTitle, issued Credit Suisse a lender's title insurance policy ("the Policy") on the mortgaged land.  The Policy was worth $227,000,000.00 and did not contain the standard exceptions for mechanics' liens and creditors' rights.

Before the Credit Agreement was signed, Credit Suisse and Stewart Title negotiated over the terms of the Policy.  On April 20, 2006, Stewart issued a "Commitment to Provide Title Insurance," which functioned as a draft of the Policy. Between issuing the Commitment and issuing the Policy, Stewart and Credit Suisse negotiated Schedule B, the list of specific exclusions to the Policy.  Stewart also requested an appraisal of Tamarack from Credit Suisse and the list of accounts payable from the Loan documents.  Credit Suisse gave Stewart an appraisal that another firm – Cushman & Wakefield – had prepared for financing purposes.  Credit Suisse also directed Stewart to communicate with Tamarack to obtain the Schedules from the Loan documents.

Tamarack had contracted with multiple builders and architects to begin construction on portions of the resort prior to May 19, 2006.  Notably, Banner/Sabey II, LLC, a general contractor, had begun construction of the Village Plaza in early April of 2006.

This becomes important because under Idaho law a contractor who has not been paid can file a mechanic's lien that attaches to the real property and takes priority over liens or mortgages that attached after the date the contractor began the work at issue. Thus, a company providing title insurance has a vested interest in knowing the date

contractors began work on a project and whether that date is prior in time to any mortgages covered by the title insurance.

Stewart obtained lien waivers from some, but not all, of the contractors prior to issuing the Policy.  Banner/Sabey II and MHTN, the architect of the Village Plaza project, did not sign waivers until several months after the Policy was issued. Banner/Sabey II had signed a contract with Tamarack in March of 2006, but had made the contract contingent on financing, which came in the form of Credit's Suisse's Loan. The Loan documents reflected this fact: at the time the Loan and Policy were issued Banner/Sabey II and MHTN were listed under Schedule 2.9, the accounts payable schedule, but were not listed under Schedule 1.1(e), the list of contractors, or Schedule 4.33, the list of material contracts.

The Loan was set to mature on May 19, 2011.  Long before that date, however, Tamarack defaulted on the Loan.  Credit Suisse filed a foreclosure action in Idaho state court and tendered to Stewart Title the defense against multiple competing liens.

Stewart Title accepted the tender and defended Credit Suisse in the state court foreclosure action.  On May 1, 2009, the state court held that the lien waivers signed by Banner/Sabey II and other contractors only waived the right to a lien for work performed before the Loan documents were recorded, but not for later performed work.

On June 29, 2009, Stewart withdrew its defense of Credit Suisse against a vendee's lien held by BAG Property Holdings, LLC.  On May 11, 2011, the state court entered findings concluding that certain mechanics' liens worth around $13 million were valid and had priority over Credit Suisse's mortgages.  On May 17, 2011, Stewart

**Memorandum Decision & Order – page 3**

withdrew its defense of Credit Suisse against these mechanics' liens and, on the next day (May 18, 2011), filed this lawsuit.  Stewart generally seeks a declaration that it does not need to indemnify Credit Suisse for any loss due to these superior mechanics' and vendees' liens.

Credit Suisse responded with a motion for partial summary judgment, seeking to dismiss some of Stewart Title's claims, and a motion to amend its complaint to add a claim for punitive damages.  The Court granted the motion to amend, finding that there was sufficient evidence to present to a jury Credit Suisse's claim that Stewart Title's denial of its claim for coverage was an extreme deviation from reasonable standards of conduct and was done with an extremely harmful state of mind.

The Court also granted in part Credit Suisse's motion for partial summary judgment, ruling as follows:  (1) The Policy affords coverage for the mechanic's liens claimed by Banner/Sabey II and MHTN, and the statutory BAG vendee's liens; (2) Stewart Title may not claim that Credit Suisse committed fraud because the Cushman & Wakefield appraisal it provided was misleading; (3) Stewart Title may not claim that Credit Suisse committed fraud because Credit Suisse knew, but failed to reveal, facts that gave priority to mechanic's liens filed by contractors Banner/Sabey II and MHTN; (4) An exclusion (§ 3(a)) under the Policy is not applicable because Credit Suisse was not responsible for the mechanic's liens; (5) An exclusion (§ 3(b)) under the Policy, that applied if the insured knew of liens that the insurer was not aware of, did not apply because Stewart Title was at least on inquiry notice as to the mechanic's liens; and (6)

**Memorandum Decision & Order – page 4**

Stewart Title cannot raise as a defense to coverage Credit Suisse's failure to pursue its remedies against Guarantors.

Both sides have now filed motions to exclude testimony from their opponent's experts. Credit Suisse has moved to exclude testimony from Bushnell Nielsen, Jeff Thompson, Michael Mason, and Robert Reilly. Stewart Title has moved to exclude testimony from Albert Rush, Philip Cook, and Kenneth Franklin. The Court will discuss each motion after reviewing the legal standards governing expert testimony.

## LEGAL STANDARDS

### Rule 702

Rule 702 should be applied with a "liberal thrust" favoring admission. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). At the same time, Rule 702 requires that "[e]xpert testimony . . . be both relevant and reliable." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir.2014).

The relevancy bar is low, demanding only that the evidence "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir.1995). Relevancy depends on the particular law at issue because "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook,* 598 F.3d 558, 563 (9th Cir.2010). The reliability threshold requires that the expert's testimony have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999).

### Ultimate Issue vs. Legal Conclusion

**Memorandum Decision & Order – page 5**

Expert testimony may "embrace[ ] an ultimate issue to be decided by the trier of fact." *See* Fed.R.Evid. 704(a).  At the same time, an expert witness "cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc*., 523 F.3d 1051, 1058 (9th Cir.2008) (excluding expert testimony labeling conduct as "wrongful" or "intentional," but allowing testimony on "industry standards" and "factual corporate norms").  *Id.*

Rule 704(a) must be read together with Rule 702.  The reason that courts exclude opinions that merely tell the jury what result to reach – for example, that a testator did not have the capacity to make a will – is that the opinion is not helpful to the jury, as required by Rule 702.  *See* 29 Wright & Gold, *Federal Practice & Procedure* § 6284 at p. 380-82.  The opinion becomes helpful when it is linked to the facts of the case.  *See Advisory Committee Notes to Rule 704*.  An example used in the Advisory Committee Notes makes this plain:

> Thus, the question "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty to formulate a rational scheme of distribution?" would be allowed.

*Id.*

## Expert Testimony in Bad Faith Litigation

Closer to the context of this case, an expert's testimony in a bad faith case that an insurer violated the standards of the insurance industry was allowed in *Hangarter v. Provident Life*, 373 F.3d 998 (9th Cir. 2004).  In that case the plaintiff claimed his insurer committed bad faith in denying his claim for disability insurance benefits.  His expert testified that the insurer (1) based its denial on "facts" it knew to be false, (2) relied on an

**Memorandum Decision & Order – page 6**

examining physician it knew to be biased in its favor, and (3) targeted claims by professionals like plaintiff for denial. *Id.* at 1010-11. The expert testified that this conduct deviated from industry standards, but never said it constituted bad faith under the law. *Id.* at 1016. The district court allowed this testimony under Rules 702 and 704(a) and the Circuit affirmed that decision.

The expert complied with Rule 702 because he (1) identified specific conduct of the insurer, (2) explained its consequences for the insured, and (3) described how that conduct deviated from industry standards, all without rendering a conclusion on the legal significance of the conduct.

## Describing Industry Standards By Referring to State Law

The insurer in *Hangarter* also challenged the expert for referring to state law while discussing industry standards. The Circuit rejected this challenge as well:

> Although [the expert's] testimony that Defendants departed from insurance industry norms relied in part on his understanding of the requirements of state law, specifically California's Unfair Settlement Claims Practice § 2695, a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.

*Id.* at 1017 (internal quotations and citations omitted). This reference to state law, the Circuit held, was proper because it was helpful to the jury in understanding the industry standards and was "ancillary to the ultimate issue of bad faith." *Id.*

## Interpreting the Title Insurance Policy

In general, the interpretation of a contract or insurance policy is a matter of law for the Court. *See PMI Mortgage v. American,* 2008 WL 3838297 (9th Cir. 2008)

**Memorandum Decision & Order – page 7**

(unpublished disposition) (excluding expert's legal interpretation of policy term). However, an expert is permitted to testify about how certain terms in the policy are commonly interpreted in the title insurance industry. *Manhattan Re–Ins. Co. v. Safety Nat'l Cas. Corp*., 2003 WL 22718008 (9th Cir. 2003) (unpublished disposition) (allowing expert to testify about industry understanding of common terms in insurance policy).

The title insurance industry's interpretation of common terms in policies is relevant here because Credit Suisse claims Stewart Title's acted in bad faith and is liable for punitive damages because its conduct was an extreme deviation from reasonable standards of conduct. Industry standards are relevant in determining whether the "extreme deviation" test for punitive damages is satisfied. *Weinstein v. Prudential Property and Cas. Ins. Co.,* 233 P.3d 1221, 1235 (Id.Sup.Ct. 2010).

Thus, an expert on the standards and practices in the title insurance industry may testify that (1) certain terms in a title insurance policy are standard in the industry; (2) title insurance companies typically interpret those provisions in certain ways; and (3) the conduct of an insurer or insured was in accord with, or deviated from, those industry practices. Such testimony in this case would be relevant under Rule 702 to either prove or rebut the claim that Stewart Title's conduct constituted bad faith or was an extreme deviation from reasonable standards of conduct.

The expert may not testify about what a certain term in the policy means and whether the insured or insurer "violated" or "complied with" that term. Embedded in such testimony are legal conclusions about contract interpretation and breach.

## ANALYSIS

**Motion to Exclude Albert Rush**

Stewart Title moves to exclude certain parts of the testimony of Credit Suisse's expert Albert Rush, a licensed attorney with long experience in the title insurance industry. Rush's basic opinion is that Stewart Title's conduct violated Idaho law and was an extreme deviation from industry standards of conduct.

In response to the motion, Credit Suisse argues first that the Court has previously held that Rush's testimony is admissible. The Court disagrees. While Judge Benson in 2014 did deny Stewart Title's motion to strike Rush's report, the only briefed issue was whether the unsworn signature of Rush was sufficient. *See Stewart Title Briefs (Dkt. Nos. 185-1 & 194).* While Judge Benson went further in his written opinion and held that Rush was qualified and that his opinions would aid the jury, that finding was not based on any arguments made in the briefing, and was not the product of extensive argument. *See Order (Dkt. No. 213).* Recognizing this, Judge Benson held that Stewart Title retained the right to renew their motion during trial. *Id.* Stewart Title is renewing the motion now, and the Court finds it was not resolved by Judge Benson.[1]

Turning to the admissibility of Rush's opinions under Rule 702, the Court finds that while portions of his testimony are subject to exclusion, most of his testimony satisfies the "liberal thrust" of *Daubert* in favor of admission¸ discussed above. The objectionable portions of Rush's testimony come largely in the form of legal conclusions.

---

[1] Credit Suisse also argues that this Court ruled that Rush's testimony was admissible in the punitive damage decision. *See Memorandum Decision (Dkt. No. 128).* But in that decision, the Court accepted at face value the testimony of experts for both sides because there were no motions to exclude or strike their testimony. Thus, the Court's punitive damages decision did not resolve the issues faced here.

He frequently opines on Idaho law and concludes that Stewart violated that law, as shown by the following examples:  (1) "Stewart had an affirmative duty to settle claims for which liability was reasonably clear.  See e.g. IC section 41-1329(6) and (13)."  *See Rush Report (Dkt. No. 291-2)* at 6; (2) "Stewart breached this duty [to timely assert any reservation of rights]"; (3) In failing to notify Credit Suisse of its intent to deny coverage, Stewart's conduct was "intentional" and "in bad faith"; and (4) Stewart Title's conduct in this case "demonstrates bad faith," *id.* at p. 9, and (at two later points in his report) that its conduct "demonstrates bad faith handling of these claims."  *Id.* at pp. 12 & 13; (5) that Stewart Title's acts were "intentional, malicious, fraudulent, oppressive, and outrageous, and that Stewart's conduct in this case was undertaken in bad faith."  *Id* at p. 19.

This is not an exhaustive list, but the examples serve to demonstrate the type of testimony that will not be allowed at trial.  In these examples, Rush is not using Idaho law to explain industry standards, as was the case in *Hangarter*, discussed above.  Instead, Rush is testifying that Idaho law imposes certain duties on Stewart and that Stewart violated those duties.  That testimony must be excluded under the legal standards quoted above.

Rush is on solid ground, however, when he explains industry standards, identifies how Stewart Title's conduct fell short of those standards, and describes the consequences of that conduct for Credit Suisse.  For example, Rush opines that Stewart Title's conduct in withdrawing its defense even though nothing had changed from its earlier acceptance was a "substantial departure from normal title insurance claims handling procedures and practices," and left Credit Suisse "in a worse position than [it] would have encountered

had it not purchased title insurance at all." *Id.* at p. 11.  He goes on to opine that "the better decision would have been for the insurer to file an action for a judicial declaration regarding coverage, and obtain judgment, before either denying coverage or withdrawing from the defense." *Id.*  This testimony describing the consequences of Stewart Title's violation of industry standards is relevant to the bad faith claim, and hence helpful to the jury under Rule 702, and does not stray into the prohibited area of a legal conclusion.

Stewart Title challenges Rush's opinions concerning the "best practice[s]" governing an insurer's demands to its insured for documentation or information in support of a claim. *Id.* at p. 15.  His testimony covers four main areas, and the Court will examine each.

First, Rush notes that "[i]n my experience, the cooperation and proof of loss requirements contained in the Policy are rarely invoked to threaten or deny coverage, and in such a case it is commonly understood the insurer must articulate some theory as to how the insurer has been prejudiced by the insured's conduct." *Id.* at p. 14.  Here, Rush is testifying based on his experience in the industry and is not making legal conclusions.

Second, Rush explains that Stewart Title's demand for documentation regarding Credit Suisse's claim – asking for "everything" – failed to "reasonably explain what is expected, and requires the insured to guess at his or her peril what is needed to protect their rights under the policy." *Id.* at p. 14.  He further testified that the "best practice" for an insurer who believes the insured is withholding information is "to require that the insured provide a statement under oath." *Id*. at pp. 14-15. Once again, this testimony

**Memorandum Decision & Order – page 11**

regarding industry standards and the consequences of Stewart's conduct for Credit Suisse

is not subject to exclusion under Rule 702.

Third, Rush describes specially what Credit Suisse did provide to Stewart Title,

and then renders a general opinion based on his review of the files:

> [I]it is my opinion that these notices of claim provided by Credit Suisse met
> or exceeded the notice of claim and proof of loss requirements contained in
> the Policy . . . .

*Id.* at p. 13.  Here, Rush concludes that Credit Suisse did not violate certain terms of the

policy.  That is an improper legal conclusion, as the Court discussed above in identifying

the governing legal standards.  Rush is not basing this opinion on industry practices and

does not confine his opinion to describing how Credit Suisse's conduct accorded with

industry practices.  Instead, he bluntly concludes that Credit Suisse complied with the

policy, a legal conclusion, rendering his testimony subject to exclusion.

In this fourth example, Rush redeems himself and gets it right.  Here he testifies

based on his review of the record that (1) Stewart Title "had in its possession or available

to it from its title agent all or substantially all it needed for a reasonable evaluation of the

Credit Suisse claims," (2) Credit Suisse was "responsive" to Stewart Title's demands for

information and was "diligent in documenting what was requested and what was

provided," (3) Stewart Title's "requests were overbroad and vague," and (4) Stewart Title

often demanded information that "had already been supplied by Credit Suisse, or was

available to Stewart through its own records . . . ."  *Id.* at p. 17.

Here Rush confines his testimony to his experience in the industry and avoids making any legal conclusions.  Moreover, this testimony is relevant under Rule 702 to prove Credit Suisse's bad faith and punitive damage claims.

Finally, Stewart Title challenges Rush's testimony regarding when an insurer should seek a judicial declaration:

> When there is a good faith dispute between insurer and insured as to coverage, the generally accepted practice in Idaho dictates that the insurer must promptly seek a judicial declaration regarding the rights of the parties, while continuing to provide a defense to the insured until excused from further obligations by an adjudication.

*Id.* at p. 9.  This testimony is based on "the generally accepted practice in Idaho," and is not a legal opinion that the conduct violates Idaho law.  Thus, it is not subject to exclusion.  It is true, however, that two sentences later, Rush concludes that Stewart Title's conduct "demonstrates bad faith."  *Id.* at p. 9.  As the Court has held above, this sentence goes too far – it opines that Stewart Title violated Idaho law, and is hence subject to exclusion.

The Court will not rule on each sentence of Rush's twenty-two page report.  It is enough to set forth the general guidelines for admissibility as the Court has done above.

**Motion to Exclude Franklin**

Credit Suisse offers Kenneth Franklin as an expert on title insurance underwriting and issuance practices in Idaho.  He worked in the title insurance industry for 48 years, and handled over 15,000 title and escrow transactions.  His qualifications are not challenged.

Stewart Title does challenge, however, Franklin's testimony purporting to describe Stewart Title's subjective knowledge or intent, and his testimony based on conjecture and speculation. For example, Stewart Title challenges Franklin's testimony that Stewart Title "knew before it closed the transaction at least that" Banner/Sabey was the general contractor on the Village Plaza project. *See Franklin Report (Dkt. No. 290-1)* at pp. 4-5. Stewart Title argues that Franklin in not a mind-reader and cannot divine Stewart Title's intent. *See U.S. v. Adams,* 2009 WL 1085490 (D.Id. 2009) (excluding expert testimony on opposing party's intent).

In an earlier decision, the Court dismissed Stewart Title's fraud claim in part on the ground that Stewart Title was at least on inquiry notice that Banner/Sabey was the general contractor on the Village Plaza project. *See Memorandum Decision (Dkt. No. 128).* The Court described the evidence that clearly demonstrated Stewart Title should have known of Banner/Sabey's work. Franklin relies on much of this same evidence to reach his conclusion that Stewart Title knew of Banner/Sabey's work.

Of course Franklin cannot know what was truly in the minds of officials at Stewart Title, but he can certainly testify without undue speculation that Stewart Title "must have known" of Banner/Sabey's work. As the Supreme Court has stated, "trained experts commonly extrapolate from existing data." *General Electric v. Joiner,* 522 U.S. 136, 146 (1997). While Stewart Title correctly points out that there is a factual dispute over what Stewart Title actually knew, "[a] factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat." *City of Pomona v. SQM North America,* 750 F.3d 1036, 1049 (9th Cir. 2014). The Court can find no reason here to exclude Franklin's

testimony so long as it does not go beyond an opinion that Stewart Title "must have known" about these matters.

Stewart Title also challenges Franklin's testimony that Stewart Title took "numerous shortcuts" in not obtaining a mechanic's lien waiver from Banner/Sabey at closing and not communicating with them in light of all the evidence that Banner/Sabey had performed work. But this testimony is solidly based on industry practice. Franklin testified that title insurers

> most often do such shortcutting with existing customers where a relationship of trust exists. It is also sometimes the result of competition pressure and pressure to bring in more business for the insurer. A transaction the size of the Credit Suisse loan ($227M) is a real boon to the insurer. To lose such a huge deal to a competitor because a competitor would shortcut or the customer would be annoyed with excessive protections would be devastating.

*See Franklin Report (Dkt. No. 290-2)* at p. 6. Franklin inferred – from this industry practice, from Stewart Title's failure to obtain the waiver at closing, and from its failure to talk to Banner/Sabey – that Stewart Title assumed the risk out of a desire to maintain its relationship with Tamarack and to "receive the very substantial premium on this transaction." *Id.* at p. 7.

Here again, Franklin is not engaging in undue speculation. He is making an inference based on industry practice and the facts of this case. This opinion is not subject to exclusion for these reasons under Rule 702. The Court has examined Stewart Title's remaining arguments for exclusion of Franklin's testimony under Rule 702 and finds them without merit.

Switching now to Rule 403, Stewart Title argues that Franklin's testimony will result in unfair prejudice and confusion.  The Court disagrees.  The probative value of his testimony is high and the danger of confusion or unfair prejudice is quite low.  Thus, the testimony is not subject to exclusion under Rule 403.

**<u>Motion to Exclude Cook</u>**

Philip Cook was retained by Credit Suisse as a damage expert, and he has long experience in appraising real estate and businesses.  While Stewart Title does not challenge his qualifications, it does challenge his opinions.

Cook testified that Credit Suisse suffered two distinct kinds of actual loss in this case.  The first loss was the drop in value of Credit Suisse's collateral when it was separated into six parcels for foreclosure by the senior lien holders, a loss that Cook estimates to be $21 million.  The second loss occurred when Credit Suisse was deprived of proceeds from the actual foreclosure sales, a loss measured by the sum of the insured-against superior liens in the amount of $14 million.

Stewart Title argues that by seeking both measures of damage, Credit Suisse wants a double recovery.  At most, Stewart Title argues, Credit Suisse is entitled to the $14 million value of the liens because if those liens had been paid off prior to foreclosure, there would have been no division – or "balkanization" – of the properties and hence no $21 million loss.  In support of this argument, Stewart Title points to Cook's testimony that paying off these liens "would have cured the mechanic's liens, and it would have probably cured the balkanization discount . . . ."  *See Cook Deposition (Dkt. No. 288-5 )*

at pp. 49-50.  This means, according to Stewart Title, that Credit Suisse is entitled to at most the cost of paying off the liens.

The Court disagrees.  As Cook testified, it is precisely because Stewart Title failed to pay off the liens prior to foreclosure that the property was divided into six parcels. When the first parcel was sold at foreclosure by the mechanic's lien holder, the value of all the parcels dropped because they were not being sold as an intact, master-planned community.  That diminution in value of $21 million is a loss suffered by Credit Suisse regardless of the amount of the liens, as Cook testified.  Cook's testimony that the $21 million in loss would not have occurred if Stewart Title had paid off the liens is accurate but not fatal.  In fact, Stewart Title did not pay off the liens, causing the diminished value that is a function of the division of the parcels, not the amount of the liens.

But that was not the full extent of Credit Suisse's damages because once the foreclosures actually took place, the senior lien holders received $14 million that otherwise would have gone to Credit Suisse.  As each parcel was sold at foreclosure, the liens amounts foreclosed upon reduced the proceeds from the foreclosure sales that were available to Credit Suisse to credit toward Tamarack's outstanding indebtedness.

Cook is not so clearly seeking a double recovery that his opinion must be excluded.  At most, the double recovery argument goes to the weight rather than the admissibility of Cook's opinion.

Stewart Title argues, however, that the $21 million dollar damage figure for diminution in value is not allowed under the policy terms.  But Credit Suisse is pursuing that sum not only under the policy but also as damages for Stewart Title's bad faith.

**Memorandum Decision & Order – page 17**

Damages under that bad faith claim include "[a] reasonable amount which will compensate [the insured] for all actual detriment proximately caused by the [insurer's] wrongful conduct." *White v. Unigard Mut. Ins. Co.*, 730 P.2d 1014, 1017-18 (Id.Sup.Ct. 1986). Cook's testimony is that the $21 million figure constitutes actual detriment proximately caused by Stewart Title's bad faith conduct. Thus, even if the title insurance policy bars such damages, they might be awardable if Credit Suisse proves bad faith. This line of testimony therefore has a basis in the law, and is not so unreliable or unhelpful that it must be excluded under Rule 702.

Stewart Title argues next that Cook picked the wrong date to value the properties. Stewart Title argues that the date of Credit Suisse's foreclosure sale is the only date Cook could use consistent with the law, and that the date he selected – about seven months prior to foreclosure – is improper. In support of this argument, Stewart Title points to the statement of this Court that "[g]enerally, it is difficult to calculate loss in a case like this until [Credit Suisse's] foreclosure sale takes place." *See Memorandum Decision (Dkt. No. 128)* at p. 18. But there, the Court was discussing loss under the terms of the policy. Here, in contrast, Credit Suisse is pursuing damages for bad faith, which are not limited by the terms of the policy, as discussed above.[2] Moreover, Cook chose his date because it was the date that Credit Suisse first lost a property to a senior lien holder in foreclosure,

---

[2] While it is true, as Stewart Title points out, that there can be no bad faith claim in Idaho if the "resulting harm is . . . fully compensable by contract damages," Credit Suisse is alleging here that their damage is not fully compensable if the title insurance policy limits their damage, and they seek that remaining damage under bad faith. *See Lakeland True Value hardware v. Hartford Fire Ins. Co.,* 291 P.3d 399, 404 (Id.Sup.Ct. 2012).

and that was the date the diminution in value occurred.  This analysis is not so unreliable or unhelpful that it must be excluded under Rule 702.

Finally, Stewart Title argues that Cook's damages testimony must be struck because Credit Suisse failed to take an opportunity to avoid all damages.  More specifically, Stewart Title points out that Credit Suisse rejected its offer to advance the full sum necessary to redeem the property from foreclosure on the ground that the central property – Village Plaza – was no longer worth the investment.  Stewart Title argues that Credit Suisse cannot argue that it lost value when it could not sell Village Plaza as part of an intact master community and at the same time argue that Village Plaza was undesirable and worth little.  Cook did not consider the redemption in his analysis.  *See Cook Deposition (Dkt. No. 288-3)* at pp. 56-58 ("I have not developed an opinion on that").  Stewart Title argues that this failure renders Cook's entire testimony unreliable. In essence, Stewart Title seeks a ruling that because it offered to redeem the property, Credit Suisse suffered no damage and that Cook's testimony should be excluded.  Stated in that way, Stewart Title's argument essentially seeks a partial summary judgment on its redemption issue.  There is an opportunity for counsel to file summary judgment motions on this issue by July 1, 2015.  Summary judgment – rather than a motion to exclude under Rule 702 – is the better vehicle for resolving this issue, and so the Court will await those motions before ruling on this issue.

## Motion To Exclude Jeffrey Thompson

Stewart offers Thompson as an expert witness in rebuttal to Rush.  As Stewart Title admits, much of Thompson's testimony focuses on whether Stewart Title complied

with Idaho law. *See Stewart Title Brief (Dkt. No. 301)* at p. 1 (Thompson's testimony "admittedly consists largely of statements of law and legal conclusions"). Stewart Title recognizes that neither Thompson nor Rush should be allowed to testify to legal conclusions, but asserts that both should be allowed to testify as to "helpful background information on industry practices." *Id.*

Credit Suisse argues, however, that Thompson – unlike Rush – has no experience in the title insurance industry and thus is not qualified to testify about title insurance industry practices. The legal standard governing this issue was set forth in *Avila v. Willits,* 633 F.3d 828 (9th Cir. 2011). There, an expert on cancer immunology, biology, and medical toxicology sought to testify that the chemical processes used by a machine shop resulted in the production of harmful dioxins that leaked from the shop and injured the plaintiff. The district court excluded the testimony, ruling that the expert would exceed the bounds of his biological and immunological expertise if he testified that the chemical process of the machine shop created dioxins that then leaked from the shop. *Id.* at 837. The Ninth Circuit affirmed, rejecting plaintiff's argument that the expert's lack of specialization went to the weight rather than the admissibility of his opinion. *Id.* at 839. The Circuit held that the "lack of specialization may go to weight only as long as an expert stays within the reasonable confines of his subject area," and the expert had strayed beyond his area of expertise. *Id.*

Applying *Avila* here, the Court must determine Thompson's area of expertise and then limit his testimony to that area. Thompson is an attorney with over 30 years of experience who has, over the last decade, spent about 80% of his time on insurance

coverage and bad faith issues. *See Thompson Deposition (Dkt. No. 279-2)* at pp. 10-11. He works primarily on issues arising with auto, health, property and casualty insurance policies. *Id.* at p. 11. He has consulted "on a couple of title insurance cases by attorneys in other firms" who inquired about "general concepts of insurance law." *Id*. at p. 15. But he has never represented any party to a title insurance bad faith case, has never represented an insured seeking coverage or benefits under a title insurance policy, and has never published or presented any material concerning title insurance. *Id.* He admits that title insurance is "not part of my regular practice." *Id.* at p. 10-11.

Nevertheless, Thompson testified that he is qualified to give expert opinions on title insurance industry practices and standards. *See Thompson Deposition (Dkt. No. 279-2)* at p. 16. The Court disagrees. Thompson has no experience in the title insurance industry with either its practices or standards. Stewart Title argues that any differences between title insurance and general insurance go the weight of Thompson's opinions not to their admissibility. But *Avila* requires that the expert stay within the bounds of his expertise. Thompson cannot testify as to title insurance industry practices and standards because he has no experience with them. The Court will therefore exclude any testimony from Thompson regarding title insurance industry practices and standards.

Having excluded any testimony from Thompson regarding legal conclusions or title insurance industry standards, the Court has excluded all of Thompson's testimony. The Court will accordingly grant the motion to exclude his testimony in its entirety.

**Motion to Exclude Mason**

Stewart Title has retained Michael Mason to (1) evaluate the Cushman &

Wakefield appraisal provided by Credit Suisse to Stewart Title, and (2) rebut the opinions

of Philip Cook.  The Court will turn first to his opinions on the appraisal.

Mason is a Certified Real Estate Appraiser with 35 years of experience, and there

is no challenge to his qualifications as an appraiser.  He concluded that the Cushman &

Wakefield appraisal "does not comply with [the Uniform Standards of Professional

Appraisal Practice (USPAP)]" and was not "completed under the [Financial Institutions

Reform, Recovery, and Enforcement Act of 1989 (FIRREA)] regulations . . . ."  *See*

*Mason Report (Dkt. No. 279-3)* at p. 3.  In addition to these deficiencies, Mason

concluded that "the appraiser appears to be attempting to bias the results to a greater

number than can be reasonably supported."  *Id.*

In its complaint, Stewart Title claimed that Credit Suisse committed fraud by

providing this appraisal that overvalued the property and misled Stewart Title into

assuming certain risks.  Credit Suisse responded by moving for summary judgment on the

ground that the appraisal clearly stated on its face that it was for financing purposes only

and could not be used to estimate the market value of the property.  The Court agreed,

and dismissed Stewart Title's fraud claim, holding that Stewart Title could not argue that

it was misled by the Cushman & Wakefield appraisal.  *See Memorandum Decision (Dkt.*

*No. 128).*

In making that ruling, the Court noted the opinions of Stewart Title's experts,

including Mason, that the appraisal was confusing.  *Id.* at p. 8.  The Court held that if the

appraisal was confusing, Stewart Title had the burden of doing a follow-up investigation

before relying on its figures, especially given the appraisal's express declaration that it did not estimate market value. *Id.* at p.9.  Stewart Title's failure to conduct such an investigation waived its right to argue that the appraisal was fraudulent.

Stewart Title recognizes the Court's ruling and states that it is offering Mason's opinions not as a defense to coverage but rather as a defense to the claims for bad faith and punitive damages.  Those two claims require a showing that Credit Suisse's claim "was not fairly debatable." *Rizzo v. State Farm*, 305 P.3d 519, 527-28 (Id.Sup.Ct. 2013). Stewart Title argues that Credit Suisse's claims were fairly debatable, and that the flaws in the appraisal – identified by Mason – "raised reasonable doubts as to coverage." *See Stewart Title Brief (Dkt. No. 305)* at p. 8.

Mason himself does not, and cannot, testify that the appraisal gave Stewart Title legitimate doubts about coverage.  He stated at his deposition that he was not retained to testify about "how Stewart Title interpreted the policy." *See Mason Deposition (Dkt. No. 305-1)* at p. 106.  Moreover, he could not testify as to how a typical title insurance company might interpret the appraisal because it is undisputed that he has no expertise in the title insurance industry. *Id.* at p. 23.

At most he is qualified to testify about flaws in the appraisal.  But is that testimony relevant?  The Court has already held that Stewart Title cannot argue that it was misled by the appraisal.  Thus, any flaws in the appraisal would appear to be irrelevant, rendering Mason's testimony, standing alone, excludable under Rule 702.

Could it become relevant when combined with the testimony of others?  Perhaps theoretically, but that theory, if there is one, is not identified or described in Stewart

Title's briefing.  At oral argument, Stewart Title's counsel stated generally that various Stewart Title officials testified in depositions that the appraisal raised concerns that eventually contributed to their decision to deny coverage and withdraw their defense of Credit Suisse.  But counsel never specifically identified this deposition testimony. Thus, there is no way for the Court to determine if these Stewart Title officials relied on the flaws identified by Mason to deny coverage, thereby providing the crucial link that would render Mason's testimony relevant.  Without that link, the Court has no choice but to exclude Mason's testimony about flaws in the appraisal.

Mason also filed a report rebutting Cook's testimony.  Credit Suisse moved to exclude that testimony, and Stewart Title has not responded.  The Court finds good cause to exclude the testimony.

With these rulings nothing remains of Mason's testimony, and Credit Suisse's motion to exclude him must be granted.

**Motion to Exclude Nielsen**

Stewart Title retained Nielsen to rebut (1) Credit Suisse's bad faith and punitive damage claims, and (2) Credit Suisse's experts Franklin and Cook.  Nielsen, an attorney, has over thirty years of experience in the title insurance industry in both the underwriting and claims areas.

The Court notes first that Nielsen's two reports, totaling about 45 pages, include numerous citations to cases, statutes, and Nielsen's own treatise.  This testimony is excludable, as another court has so found in ruling on Nielsen's testimony.  *See Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.,* 2011 WL 204619

(E.D.Pa. 2011) (excluding Nielsen's opinions based on case law and statutes while admitting his testimony confined to industry standards).

At the same time, as *Nationwide* recognized, Nielsen's testimony on industry standards is appropriate under Rule 701.  For example, he testifies that "the custom of claim administrators in the title insurance business is to deny payment of claims when the insured has failed to disclose or has intentionally concealed important facts that increase the risks assumed in the policy."  *See Nielsen Report (Dkt. No. 282-3)* at p. 2.  That testimony, based on Nielsen's long experience in the industry, is relevant under Rule 702 because it addresses (1) Credit Suisse's claims that Stewart Title's failure to pay – and demands for additional information to support the claim – was an extreme deviation from reasonable standards of conduct, and (2) Stewart Title's claim that it was following the standards of the title insurance industry.

But later on the same page of his report, Nielsen goes too far in testifying that "[t]he failure by the insured to disclose a material risk causes the policy, or that particular coverage, to be void for concealment."  *Id.*  Here, Nielsen is rendering a legal conclusion that certain conduct renders a policy "void."  As discussed above, that is improper under Rule 702 and must be excluded.

For the same reasons, there are four additional opinions that must be excluded.  In each of these four opinions, Nielsen identifies various "obligations" and concludes that an insurer is "entitled" to certain rights.  This is terminology associated with legal conclusions rather than industry practices, and each such opinion must be excluded. Those four opinions are as follows:

**Memorandum Decision & Order – page 25**

Opinion 1: "[T]hat a title insurer that is defending the priority of the insured mortgage against competing liens is entitled to pursue that litigation to a final determination" and that "until there has been a final determination in that action, a lawsuit by the insured lender seeking payment of a loss is premature." *See, Nielsen Report (Dkt. No. 282-4)* at pp. 8-9.

Opinion 2: "The insurer is not obligated to pay liens when it receives a demand from the insured" and, conversely, "the insured [is not] entitled to seek an order commandpo'ing the insurer to pay the liens." *Id.* at p. 12.

Opinion 3: "The insured may . . . not pay the liens and seek reimbursement from the insurer, which is specifically prohibited by the voluntary settlement provision of the Policy." *Id.* at p. 12.

Opinion 4: "[I]n seeking protection from Stewart Title against inchoate mechanics' lien rights, Credit Suisse was obligated to disclose the information it knew prior to closing about Banner-Sabey's work at Tamarack and its contract." *See Nielsen Rebuttal Report (Dkt. No. 282-3)* at pp. 1-3.

Credit Suisse also challenges Nielsen's opinions rebutting Credit Suisse's expert on damages, Philip Cook. Nielsen concedes that he is not an expert appraiser like Cook, but argues that he is challenging Cook's damage methodology, rather than his underlying appraisal, by showing it does not align with "the standard practice for measuring loss in the title insurance industry." *See Stewart Title Brief (Dkt. No. 306)* at p. 10.

While Nielsen prefaces his opinions with reference to industry custom, they are often nothing more than legal conclusions. For example, Nielsen opines that Cook errs by assuming that "someone will pay at least $100,000,000 to build new improvements on the property," and explains that

[l]oss under a title insurance policy is not measured as the potential value of hypothetical buildings that might be built on the property in the future. It is based on the value of the property as of the date of loss, with and without the covered titled matter. This rule was stated in the seminal modern case of *Overholtzer v. Northern Counties Title Ins. Co.,* which held that "liability should be measured by diminution in the value of the property caused by

the defect in title as of the date of the discovery the defect, measured by the use to which the property is then being devoted."

*See Nielsen Rebuttal Report, supra,* at p. 20. Nielsen continues by quoting from his own treatise that contains additional legal citations. *Id.* at p. 21. He explains further that

> [l]oss under a title insurance policy is not measured based on the future value of land that might be developed even when the development plan is frustrated or limited due to a covered title defect. *Pulte Home Corp. v. Industrial Valley Title Ins. Co.* is still the leading case observed by the industry on the subject.

*Id.* at p. 22. These opinions are straight legal conclusions. While it is true, as the Court discussed above, that *Hangarter* allows an expert to discuss the law in connection with explaining industry standards, Nielsen's opinions quoted above do not discuss how industry standards are informed by the law; they simply describe the law. But even if Nielsen is attempting to explain industry standards on damages, he has strayed into an area exclusively reserved for the Court: He is not describing the damage suffered by the parties (for which he has no qualifications) but is instead opining on the method a jury should use to calculate damages ("loss . . . is not measured based on the future value of land"). That is improper. *See Basic American, Inc. v. Shatila*, 992 P.2d 175, 194 (Id.Sup.Ct. 1999) (holding that "[a]lthough the calculation of damages . . . is a factual determination, the formula used in making that calculation is a question of law"). These opinions on the formula to be used to calculate damages will therefore be excluded.[3]

---

[3] Another such opinion that must be excluded for the same reason is as follows: "When a final determination has been made [regarding priority and amount of adverse liens], the value of the Resort can be measured. If the value of all the property on which Credit Suisse holds a security interest is less than the total amount of indebtedness, a loss would

(Continued)

Credit Suisse seeks next to exclude Nielsen's opinion concerning Stewart Title's offer of settlement with the lien claimants.  That opinion is as follows:

> It is my opinion that Stewart Title went considerably beyond industry custom by offering in September, 2010 to pay up to $3 Million toward the cost of settlements with lien claimants. I assume the amount was well in excess of the expected cost of litigation. That offer was, in my opinion an exceptionally large benefit offered by Stewart Title to its insured and not required by the Policy or industry custom.

*See Nielsen Report (Dkt. 282-4)* at p. 14.  The flaw in this opinion is that it is based entirely on Nielsen's assumption that "the amount was well in excess of the expected cost of litigation."  He never testifies that such an assumption is typical in the industry – indeed, that would be absurd because calculating (not assuming) the expected cost of litigation is a key part of the process, according to his own testimony.  *Id.* at pp. 13-14. Because this opinion concerning industry practices is based on an assumption that is not an industry practice, it must be excluded under Rule 702.

Credit Suisse challenges another group of opinions on the ground that they relate to underwriting issues, which, according to Credit Suisse, "are now irrelevant to the issues for trial and should be excluded."  *See Credit Suisse Brief (Dkt. No. 312)* at p. 3. When Stewart Title counters that underwriting issues are relevant to rebut Credit Suisse's bad faith and punitive damage claims, Credit Suisse responds that those claims "are not

---

be payable that is equal to the lesser of (i) the amount of [Credit Suisse's] reduced security or (ii) the amount of the liens that have been adjudged to have priority over the Mortgage." *See Nielsen Report, supra* at p. 21.

premised on Stewart's underwriting conduct." *Id.*  But Credit Suisse's experts have made underwriting an issue.  For example, Credit Suisse's expert Kenneth Franklin concludes that Stewart Title assumed too much risk in the underwriting because it wanted to be part of a very lucrative deal.  *See Franklin Report (Dkt. No. 290-2)* at p. 7.  The gist of his testimony is that Stewart Title got greedy in the underwriting process, assumed too much risk, and then attempted to dump that risk on Credit Suisse.  Because Credit Suisse's own experts are making underwriting an issue, Nielsen will be allowed to testify about industry standards and practices concerning underwriting.

Finally, Credit Suisse has challenged other opinions on industry standards.  In these opinions, Nielsen is testifying (without making legal conclusions) that Stewart Title followed industry practices by electing to pay to defend against the lien claims in the foreclosure action and in ultimately denying coverage to Credit Suisse under the policy.  Those opinions will be allowed.

**Motion to Exclude Reilly**

Stewart Title retained Robert Reilly to (1) "provide an independent estimate of the economic damages, if any, suffered by Credit Suisse as a result of the alleged wrongful acts of [Stewart Title]" and (2) "review and critique the [Credit Suisse] damages analysis prepared by [Cook] . . . ."  *See Reilly Report (Dkt. No. 283-4)* at p. 1.  Reilly is a certified appraiser and a CPA with long experience in business and asset valuation.

Reilly renders opinions that (1) Cook erred by including in Credit Suisse's damages the Local Improvement District (LID) liens totaling $11 million because Cook mistakenly listed them as an insured-against encumbrance when they should have been

labeled as an unavoidable encumbrance similar to property taxes; (2) Cook erred in setting his total damages above the sum that Credit Suisse would have received if there were no superior liens; (3) Cook double-counted when he added the lien sums to the balkanization damages; (4) Cook's discount rate was too low because he failed to take into account the risky nature of the development and the fact that Tamarack was a distressed project and not an institutional-investment project, among other flaws; (5) if the above 4 errors are corrected, the damages suffered by Credit Suisse due to the alleged balkanization would total no more than $6.5 million; and (6) damages would be zero if Credit Suisse had agreed to Stewart Title's offer to redeem the properties.

Credit Suisse argues that these opinions should be excluded because Reilly exceeded the bounds placed on him by Judge Benson in his Order of October 15, 2014. *See Order (Dkt. No. 213).* In that Order, Judge Benson granted in part and denied in part Stewart Title's motion to substitute Reilly as an expert for Trey Knipe, who had filed a short report but passed away after the expert discovery deadline had closed. Judge Benson held that fairness required that Stewart Title be allowed to substitute Reilly in Knipe's place, but also held that it would be "prejudicial to allow Stewart Title to make a drastic change in their expert analysis at this point in the proceedings." *Id.* at p. 5. To strike a balance, Judge Benson relied on Stewart Title's representation that "they do not intend to change the analysis, [but] simply intend to change the source of the analysis." *Id.* Accordingly, Judge Benson allowed Stewart Title to "designate a substitute expert witness regarding any topic on which Mr. Knipe had previously opined." *Id.* at p. 6.

To resolve Credit Suisse's argument that Reilly exceeded the bounds of this Order, the Court begins by defining the topics "on which Mr. Knipe had previously opined." Knipe was a certified appraiser who stated that his opinions were "limited to a desk review of [Cook's] appraisal." *See Knipe Report (Dkt. No. 283-2)* at p. 1.  He rendered the following opinions:  (1) Cook should have estimated damages as of the date of the foreclosure, and not attempted to speculate about development over the next 17 years; and (2) Cook's discount rate of 18% was too low because it failed to take into account how risky the Tamarack development was – the proper rate according to Knipe would have been "25-30 percent, or even higher."  *Id.* at 3-5.  Knipe took just 5 pages to explain these opinions.

Reilly, on the other hand, filed a 34 page report in which he not only rebuts Cook's analysis, but also provides "an independent estimate of the economic damages, if any, suffered by Credit Suisse."  *See Reilly Report, supra* at p. 1.  Stewart Title explains that "Reilly approached his task as an economic damages analyst, not a real estate appraiser . . . ."  *See Credit Suisse Brief (Dkt. No. 302)* at p. 12.

This creates a real problem for Stewart Title because Knipe was an appraiser, not an economic damages analyst.  The only opinion rendered by Reilly that is confined to Knipe's topics is that Cook's discount rate was too low; Reilly's other opinions all rely on his expertise as an economic damage expert, an expertise not shared by Knipe, who did not address economic damages.  Certainly, Reilly was not confined to repeating verbatim Knipe's 5-page report.  But he was clearly and appropriately limited by Judge Benson to the subject matter of Knipe's opinions – that is, the calculation of the discount

rate and the setting of the date for the damage estimate.  Reilly's opinions – other than those concerning the discount rate – go far beyond Knipe's and violate that part of Judge Benson's Order.

Stewart Title argues that Cook supplemented his reports, and that Reilly "necessarily went beyond what Knipe was able to do" in order to respond to Cook's supplementations.  *See Stewart Title Brief (Dkt. No. 302)* at p. 8.  But Cook's supplementations did not change his methodology or analysis; they merely updated certain figures based on the foreclosures and corrected errors.  There is nothing in those supplementations that would allow Reilly to expand his opinions beyond those allowed by Judge Benson.

Stewart Title responds that Knipe had the right to supplement his report under Rule 26(e), and that Reilly, as his substitute, was simply exercising that right.  But "[a] party may not rely on Rule 26(e)(1) as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report."  *Medtronic v. Abbott Cardiovascular Systems, Inc.,* 2008 WL 4601038 (N.D.Cal. 2008).  Here, Reilly's opinions are admittedly based on his economic analysis rather than an appraisal analysis, and so constitute new opinions, rather than a mere supplement.

There is, however, a twist in this analysis.  In a separate section of his Order, Judge Benson grants Stewart Title's motion to reopen discovery on the redemption issue, and allows Stewart Title to file "a supplemental expert report on Credit Suisse's failure to mitigate damages."  *See Order, supra* at p. 4.  Reilly is the expert who addressed that issue.  As discussed, one of Reilly's opinions is that Credit Suisse failed to mitigate

damages when it rejected Stewart Title's redemption tender.  That particular opinion falls within the scope of Judge Benson's Order.

The analysis to this point demonstrates that two opinions by Reilly are within those allowed by Judge Benson:  (1) The redemption offer, if accepted, would have completely mitigated Credit Suisse's damages; and (2) The discount rates are too low.

Three other opinions fall outside those permitted by Judge Benson's Order and must be excluded: (1) Cook erred by including in Credit Suisse's damages the Local Improvement District (LID) liens totaling $11 million because Cook mistakenly listed them as an insured-against encumbrance when they should have been labeled as an unavoidable encumbrance similar to property taxes; (2) Cook erred in setting his total damages above the sum that Credit Suisse would have received if there were no superior liens; (3) Cook double-counted when he added the lien sums to the balkanization damages.

One remaining opinion must be considered – Reilly opined that if the four errors in the Cook report were corrected (that is, the discount rate error and the three other errors that have now been excluded above) the balkanization damages would be $6.5 million.  Now that the Court has excluded three of the four opinions on which this $6.5 million figure is based, this opinion must be likewise excluded.

With regard to the two opinions that the Court has not excluded, Stewart Title argues that Reilly is not qualified to opine on either.  The Court disagrees.  Reilly is a CPA and he served on the Executive Committee of the American Institute of Certified Public Accountants (AICPA) at the time the AICPA issued its report on the proper

manner of calculating discount rates.  *See Reilly Deposition (Dkt. No. 283-3)* at pp. 27-28.  He was one of the reviewers of that report.  *Id.*  In addition to being a certified general appraiser in Idaho, he has had long experience in the area of business and property valuations, and has written extensively about valuation issues, including analyses of AICPA valuation standards.  *See Report (Dkt. No. 283-4)* at p. 63.  These credentials qualify Reilly to testify to the two opinions that the Court is not excluding.

In conclusion, the Court will grant in part and deny in part the motion to exclude Reilly's opinions.  The Court will deny the motion as to two opinions:  (1) The redemption offer, if accepted, would have completely mitigated Credit Suisse's damages; and (2) The discount rates are too low.

The Court will grant the motion as to four other opinions and order that they be excluded:  (1) Cook erred by including in Credit Suisse's damages the Local Improvement District (LID) liens totaling $11 million because Cook mistakenly listed them as an insured-against encumbrance when they should have been labeled as an unavoidable encumbrance similar to property taxes; (2) Cook erred in setting his total damages above the sum that Credit Suisse would have received if there were no superior liens; (3) Cook double-counted when he added the lien sums to the balkanization damages; and (4) The balkanization damages are $6.5 million.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions to exclude testimony of Thompson (docket no. 280) and Mason (docket no. 292) are GRANTED and that the testimony of these experts shall be excluded.

IT IS FURTHER ORDERED, that the motions to exclude Franklin (docket no. 290) and Cook (docket no. 288) are DENIED.

IT IS FURTHER ORDERED, that the motions to exclude the testimony of Nielsen (docket no. 284) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to exclude the following testimony of Nielsen:

(1)     All testimony citing cases, statutes, and his treatise, including but not limited to the following:  (a) "The failure by the insured to disclose a material risk causes the policy, or that particular coverage, to be void for concealment."  *See Nielsen Report (Dkt. N0. 282-3)* at p. 2; (b) "[T]hat a title insurer that is defending the priority of the insured mortgage against competing liens is entitled to pursue that litigation to a final determination" and that "until there has been a final determination in that action, a lawsuit by the insured lender seeking payment of a loss is premature."  *See, Nielsen Report (Dkt. No. 282-4)* at pp. 8-9; (c) "The insurer is not obligated to pay liens when it receives a demand from the insured" and, conversely, "the insured [is not] entitled to seek an order commanding the insurer to pay the liens."  *Id.* at p. 12; (d) "The insured may . . . not pay the liens and seek reimbursement from the insurer, which is specifically prohibited by the voluntary settlement provision of the Policy."  *Id.* at p. 12; (e) "[I]n seeking protection from Stewart Title against inchoate mechanics' lien rights, Credit Suisse was obligated to disclose the information it knew prior to closing about Banner-Sabey's work at Tamarack and its contract." *See Nielsen Rebuttal Report (Dkt. No. 282-3)* at pp. 1-3.

(2)     All testimony concerning the proper measure of damage such as the following:  (a) "Loss under a title insurance policy is not measured as the potential value of hypothetical buildings that might be built on the property in the future.  It is based on the value of the property as of the date of loss, with and without the covered titled matter. This rule was stated in the seminal modern case of *Overholtzer v. Northern Counties Title Ins. Co.,* which held that "liability should be measured by diminution in the value of the property caused by the defect in title as of the date of the discovery the defect, measured by the use to which the

property is then being devoted." *See Nielsen Rebuttal Report, supra,* at p. 20. (b) "Loss under a title insurance policy is not measured based on the future value of land that might be developed even when the development plan is frustrated or limited due to a covered title defect. *Pulte Home Corp. v. Industrial Valley Title Ins. Co.* is still the leading case observed by the industry on the subject."; (c) "When a final determination has been made [regarding priority and amount of adverse liens], the value of the Resort can be measured. If the value of all the property on which Credit Suisse holds a security interest is less than the total amount of indebtedness, a loss would be payable that is equal to the lesser of (i) the amount of [Credit Suisse's] reduced security or (ii) the amount of the liens that have been adjudged to have priority over the Mortgage." *See Nielsen Report, supra* at p. 21.

(3)    Any opinions based on improper assumptions such as the following: "It is my opinion that Stewart Title went considerably beyond industry custom by offering in September, 2010 to pay up to $3 Million toward the cost of settlements with lien claimants. I assume the amount was well in excess of the expected cost of litigation. That offer was, in my opinion an exceptionally large benefit offered by Stewart Title to its insured and not required by the Policy or industry custom." *See Nielsen Report (Dkt. 282-4)* at p. 14.

(4)   The motion is denied in all other respects.


     IT IS FURTHER ORDERED, that the motion to exclude Reilly (docket no. 286)

is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to

exclude the following testimony of Reilly:

   (1) Cook erred by including in Credit Suisse's damages the Local Improvement
       District (LID) liens totaling $11 million because Cook mistakenly listed them as
       an insured-against encumbrance when they should have been labeled as an
       unavoidable encumbrance similar to property taxes; (2) Cook erred in setting his
       total damages above the sum that Credit Suisse would have received if there were
       no superior liens; (3) Cook double-counted when he added the lien sums to the
       balkanization damages; and (4) The balkanization damages are $6.5 million.
   (2) The motion is denied in all other respects.

IT IS FURTHER ORDERED, that the motion to exclude Rush (docket no. 291) is

GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to

exclude the following testimony of Rush:

(1) Any testimony that constitutes a legal conclusion, including the following:  (a) "Stewart had an affirmative duty to settle claims for which liability was reasonably clear.  See e.g. IC section 41-1329(6) and (13)."  *See Rush Report (Dkt. No. 291-2)* at 6; (b) "Stewart breached this duty [to timely assert any reservation of rights]"; (c) In failing to notify Credit Suisse of its intent to deny coverage, Stewart's conduct was "intentional" and "in bad faith"; and (d) Stewart Title's conduct in this case "demonstrates bad faith," *id.* at p. 9, and (at two later points in his report) that its conduct "demonstrates bad faith handling of these claims."  *Id.* at pp. 12 & 13; (e) that Stewart Title's acts were "intentional, malicious, fraudulent, oppressive, and outrageous, and that Stewart's conduct in this case was undertaken in bad faith."  *Id* at p. 19.

(2) All testimony giving a legal interpretation of the Policy, including the following:  (a) "[I]it is my opinion that these notices of claim provided by Credit Suisse met or exceeded the notice of claim and proof of loss requirements contained in the Policy . . . ."  *Id.* at p. 13.

(3) The motion is denied in all other respects.

DATED: July 13, 2015

B. Lynn Winmill
Chief Judge
United States District Court

**Memorandum Decision & Order – page 37**